The **AMBERLEY COMPANY**, Plaintiff-Appellant,

v.

The **BROWN COMPANY**, Defendant-Appellee.

No. 18631.

United States Court of Appeals Sixth Circuit.

April 17, 1969.

---

J. Warren Kinney, Jr., Cincinnati, Ohio, for appellant.

Truman A. Herron, Cincinnati, Ohio, Herbert C. Brinkman, Jr., Bruce Tittel, Cincinnati, Ohio, on brief; Wood, Herron & Evans, Cincinnati, Ohio, of counsel, for appellee.

Before WEICK, Chief Judge, and CELEBREZZE and McCREE, Circuit Judges.

WEICK, Chief Judge.

This appeal is from a judgment of the District Court in favor of the defendant, dismissing the complaint, in an action for injunctive relief and damages for breach of a disclosure agreement relative to a secret process of plaintiff-appellant, The Amberley Company [Amberley].

Amberley filed a motion in this Court to strike and expunge portions of appellee's brief and appendix that refer to a Patent Interference decision relating to the trade secret in question. Since we are able to dispose of the case without relying on the Patent Interference decision, we need not rule on the motion.

Amberley entered into a written "Disclosure Agreement" on August 30, 1961, with KVP-Sutherland Paper Company [KVP].[1] The subject of the agreement was the Amberley process for reclaiming cellulose fibers from polycoated scrap paper, such as milk carton stock, which is referred to as "broke."

In June, 1961, Amberley had developed the only commercially feasible process in the industry. A patent application covering the process was filed on March 1, 1961 and granted on October 27, 1964. The Amberley process, as described in patent claim 3 of U. S. Patent No. 3,154,-255, was:

"The process of separating and reclaiming cellulose fiber from thermoplastic coated broke, which comprises charging the broke in a dry condition into a treatment receptacle together with water at ambient temperature, violently agitating and subjecting the mixture to centrifugal forces to break the physical bonds securing the film to the body of cellulose material and simultaneously effecting parting of the film from the cellulose body and reducing the latter to a cellulose fiber pulp, then withdrawing pulp laden water while continuously adding 'make-up' water and continuing the stated agitation and effecting movement of the water in a manner to lift and remove the separated film from the area of withdrawal of the cellulose fiber pulp to thereby avoid interference by the parted film of passage of the fiber laden water from the receptacle and retaining substantially all of the film therein for separate recovery."

The unique feature of the Amberley process is the maintenance of the contents of the pulper tub at a constant high level during the extraction cycle by the continuous addition of water.

In 1960 Amberley contacted Black-Clawson Company, a manufacturer of pulp-extraction and screening equipment, as a source for the type of equipment which it needed to practice its process on

---

1. KVP was acquired by The Brown Company, appellee, in 1966, and Brown was substituted as a party defendant in the place of KVP.

a commercial scale. Amberley paid Black-Clawson for the purpose of making tests in polycoated broke. After a series of tests, Amberley decided to purchase equipment from Black-Clawson and advised it of the Amberley process and how it expected to use the equipment in connection therewith. Amberley considered the disclosure of its process to Black-Clawson as confidential and the District Judge so treated it. On July 8, 1961 Amberley put Black-Clawson on formal notice by letter that it had learned that Black-Clawson was disclosing Amberley's trade secrets, in violation of its confidential relationship, and insisted that it refrain from making future disclosures.

KVP had tried unsuccessfully to develop a pulp and extraction process but when it learned that Amberley had developed a new process, it requested that Amberley furnish it with samples of the raw materials and finished products. After studying the samples KVP was informed by Amberley that it had a patent pending on its process and that if KVP was interested in learning about the process it would be necessary that the parties enter into a disclosure agreement.

Subsequently, a disclosure agreement was drafted by Amberley, redrafted by KVP and forwarded to Amberley on August 30, 1961. The pertinent paragraphs thereof are as follows:

"1. KVP agrees to maintain the subject process in confidence to the extent that said process is not already properly known to KVP and KVP agrees to keep secret all information and know-how obtained from Amberley except such information and know-how that are, or become, known to the public, other than through an act or failure to act on the part of KVP, and such information and know-how that are furnished to KVP by any third party having a bona fide right to do so.

"2. Amberley, in consideration for the covenant of KVP to maintain the said process in confidence, agrees to reveal the subject process to selected personnel of KVP in order that the said KVP personnel may be fully apprized of all phases of the aforesaid process.

\* \* \* \* \* \*

"4. KVP covenants and agrees to do nothing which will or might, directly or indirectly, lessen the value of the aforesaid process to Amberley; and KVP agrees not to disclose, use or practice the aforesaid process in the absence of a license agreement with Amberley."

On September 7, 1961 Mr. Schulman of Amberley called Mr. George Rumberger, KVP's "Fundamental Research Man," and objected to some of the redrafted provisions. However, after discussion, Schulman withdrew his objections and indicated that he would sign, which he did, and he returned the agreement to Rumberger.

On September 21, 1961, after the agreement was executed, KVP agreed to meet with Amberley. However, upon further consideration KVP decided not to meet with Amberley because it thought it could get a better deal from Black-Clawson. KVP was aware that Black-Clawson knew of the Amberley process and that Black-Clawson had done some work with Amberley in connection with the project. However, Black-Clawson assured KVP that it was not in a confidential relationship with Amberley, and that Amberley's process was in the public domain.

In January, 1962, Flanagan, KVP's Technical Director, observed the operation of a Hydrapulper at the premises of Black-Clawson. In March, 1962, KVP surreptitiously purchased the first of a series of a half dozen carloads of reclaimed cellulose fibers which had been processed by Amberley. Later, in May, the Board of Directors of KVP authorized the purchase of $298,000 of Black-Clawson equipment.

In an article appearing in "Paper Trade Journal" dated October 1, 1962, written by Jack McKela, who was at that time an assistant manager of a division of Black-Clawson, every detail which Amberley alleged to be a part of its

secret process was discussed and made available to the public. McKela described the process as follows:

"The basic system is relatively simple consisting of a suitable sized Vokes type Hydrapulper which is designed to generate efficiently the 'poly' from the papermaking fiber during a batch type defibering operation. After 10 to .15 minutes of defibering, wash water is added continuously and the fiber is extracted continuously to a dump chest. The equivalent of four times the original volume is added in wash water with the result that the stock consistency drops from about seven per cent to 1.3 per cent. This washing operation takes about 15 to 20 minutes."

In November, 1962, KVP installed Black-Clawson equipment in its plant, with which it began to practice the Amberley process. KVP never negotiated with Amberley again, nor were any disclosures of the process ever made to KVP by Amberley.

The District Court in its opinion made eighty-five separate Findings of Fact and Conclusions of Law, which may be summarized as follows:

1) Amberley possessed a trade secret, the Amberley process, in September, 1961;

2) Amberley never disclosed its process to KVP;

3) KVP learned of Amberley's process from Black-Clawson in good faith and not in violation of the disclosure agreement;

4) Prior to KVP's use of the Amberley process it was public knowledge through McKela's Trade Journal article; and

5) KVP has been using Amberley's process ever since 1962.

Amberley contends that it disclosed its trade secret to KVP; that KVP acquired knowledge of its process from Black-Clawson in bad faith; and that KVP breached the disclosure agreement by using the process without a license. We are of the opinion that these contentions are without merit and that the judgment of the District Court should be affirmed.

■ As before stated, the District Judge found that Amberley did not disclose its secret process to KVP at any time. Amberley contends that its Mr. Schulman disclosed its process to Mr. George C. Rumberger of KVP in a telephone conversation on September 7, 1961. Schulman and Brown, both employees of Amberley, testified that Schulman disclosed in the telephone conversation not only the process, but also a price for royalties, and details of manufacture. Rumberger denied that any such conversation ever took place. The District Judge resolved the issue by crediting the testimony of Rumberger. He obviously did not believe the testimony of Schulman and Brown. We are of the opinion that this finding of fact of the District Judge is supported by substantial evidence and is not clearly erroneous. United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

The District Judge further found that KVP learned of the Amberley process from Black-Clawson in good faith. There was no question but that KVP was aware that Black-Clawson knew of the Amberley process. The District Judge found as follows:

" * * * Black-Clawson, however, assured KVP that it, Black-Clawson, was in no confidential relationship with Amberley, that Amberley's methods (or process) included nothing that was not already in the public domain." (Finding of Fact 32).

"The essence of the so-called 'Amberley Process' * * * was first disclosed to KVP by Black-Clawson sometime in late 1961. While Black-Clawson, in so doing, violated (on this record) its confidential relationship with Amberley * * * KVP received the information in good faith, believing Black-Clawson's representations. * * * *" (Finding of Fact 32a).

"A person skilled in the art could, by observing the manner in which the

Amberley system is operated, obtain full knowledge of the Amberley 'process.'" (Finding of Fact 35).

"It was (prior to the issue of the patent) established that all of the defendant's information as to the operation of its fiber recovery system came to it either (a) as a matter of common knowledge in the industry, (b) from the publications referred to herein, or (c) from the Black-Clawson Company." (Finding of Fact 68).

"Before the start up of the KVP polyethylene defibering system in November, 1962, every detail which Amberley has alleged to be a part of its secret process, system or apparatus was discussed and made available to the public in an article in 'Paper Trade Journal' dated October 1, 1962, by Jack McKela, and in an address given by Mr. McKela at the Paper Stock Institute on September 21, 1962. (Defendant's Exhibit 11)" (Finding of Fact 69).

■ There is no evidence in the record that KVP acquired the trade secret in violation of any confidential relationship with Amberley. KVP's only obligation to Amberley is contained in the disclosure agreement.

Amberly contends that KVP breached paragraph 4 of the disclosure agreement by practicing the trade secret without a license from Amberley. Paragraph 4 must be read in conjunction with paragraph 2 which contemplated a disclosure by Amberley. The District Judge found that there was no disclosure by Amberley at any time. As the District Judge aptly stated:

"The defendant was in no confidential relationship to the plaintiff. If anything, the nondisclosure agreement only emphasizes that. It carefully limited any confidentiality to what it learned from the plaintiff—from the plaintiff it learned nothing."

Because there was no disclosure by Amberley to KVP, the consideration for the agreement failed and KVP had no ob-

ligation to perform it. Restatement, Contracts §§ 274.(1) and 399.(1) (1932).

■ Furthermore, even if there had been a disclosure by Amberley prior to the time that KVP actually practiced the trade secret, the process was in the public domain and was no longer entitled to protection.

The conduct of KVP can hardly be classified as exemplary, but we have dealt only with the problem of legal liability.

Affirmed.