## SURGIDEV CORPORATION, a California corporation, Plaintiff,

v.

## EYE TECHNOLOGY, INC., a Delaware corporation, and Robert J. Fitzsimmons, Frederick G. Kalfon, James A. Greiling and Debra J. McCoy, Individuals, Defendants.

Civ. No. 4–85–1376.

United States District Court, D. Minnesota, Fourth Division.

Oct. 10, 1986.

On Motion to Amend Nov. 17, 1986.

---

See also 625 F.Supp. 800.

Hugh D. Jaeger, Minneapolis, Minn., and Wayne Willenberg, Martin Horn, and David M. Simon, Spensley, Horn, Jubas & Lubitz (of counsel), Los Angeles, Cal., for plaintiff.

Duane W. Krohnke, Calvin Litsey, James L. Volling, and James C. Wine, Faegre & Benson, Minneapolis, Minn., for defendants.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

### TABLE OF CONTENTS

FACTS ........................................................ 668
The Intraocular Lens Industry ......................................... 669
Surgidev ..................................................... 672
Non-Disclosure Agreements .............................................. 675
ETI ......................................................... 676

DISCUSSION ...................................................... 679
A. Choice of Laws ................................................... 679

B. Trade Secrets ..................................................... 680
 1. Customer Information .......................................... 680
 a. *Hollingsworth* analysis ...................................... 681
 b. Hospitals and/or Clinics ..................................... 686

 2. IOL and PMMA Monofilament "Know-How" and New Products..... 687
 a. Trade Secret Ownership ...................................... 687
 (1) Not Generally Known or Easily Ascertainable .............. 688
 (a) Not Generally Known—PMMA Monofilament ........... 688
 (b) Not Generally Known—
 IOL Manufacturing Know-How ...................... 689
 (c) Not Generally Known—New Products.................. 689
 (d) Not Generally Known—
 Remaining Categories of Customer Information ....... 690
 (i) Influential Ophthalmologists ....................... 690
 (ii) Consultants & Non–Medical Consultants ............ 691
 (iii) Medical Monitor ................................. 691
 (2) Provide a Competitive Advantage ........................ 692
 (3) Confidentiality ......................................... 692
 b. Disclosure, Legal Relationship, and Use ...................... 694
 c. Duration................................................. 696

C. Breach of Contract.................................................. 696

DISCUSSION
D. Tortious Interference ............................................. 699
CONCLUSION ..................................................... 700

This matter is before the Court on plaintiff's motion for preliminary and permanent injunctive relief. Plaintiff's motion will be granted in part and denied in part.

**FACTS**

Plaintiff Surgidev Corporation (Surgidev) is a California corporation with its principal place of business in Goleta, California, engaged in the manufacture and sale of intraocular lenses (IOLs). Defendant Eye Technology, Inc. (ETI), is a Delaware corporation headquartered in St. Paul, Minnesota, also engaged in the manufacture and sale of IOLs. Defendants Robert J. Fitzsimmons, Frederick G. Kalfon, James A. Greiling and Debra McCoy are former Surgidev officers and employees now associated with ETI. This is an action alleging unfair competition, misappropriation of trade secrets, breach of contract, breach of fiduciary duty, conversion, and tortious interference with contractual relations and prospective economic advantage. Jurisdiction lies under the Court's diversity powers, 28 U.S.C. § 1332, and venue is proper by virtue of 28 U.S.C. § 1391. Plaintiff seeks preliminary and permanent injunctive relief, as well as compensatory and punitive damages. By stipulation and order dated February 12, 1986, and pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, plaintiff's motion for preliminary injunctive relief was consolidated with plaintiff's prayer for permanent injunctive relief. A consolidated hearing was conducted March 10–19, 1986. Additional arguments were heard and evidence taken April 15, 1986, and June 30, 1986.

Plaintiff originally submitted to the Court a proposed form of injunction. The following is taken verbatim therefrom. Plaintiffs seek to enjoin defendants from:

1. Soliciting for employment or attempting to solicit for employment or hire any SURGIDEV employees for a period of two years from [the date of filing];

2. Hiring any SURGIDEV employees for a period of six months after they have left the employment of SURGIDEV;

3. Having Myron Lippman perform any services on behalf of [ETI] and/or its employees, agents, officers and all persons acting in concert with it with actual notice of this order until October, 1987;

4. Purchasing or obtaining PMMA monofilament from MYRON LIPPMAN, Lippman Engineering Co. (LENCO) and/or L.I.M.R. or their officers, agents, servants, employees and attorneys and any and all persons in active concert or participation with them;

5. Having MYRON LIPPMAN, Lippman Engineering Co. (LENCO) or L.I.M.R. and/or their officers, agents, servants, employees and attorneys and any and all persons in active concert or participation with them make and/or supply PMMA monofilament until 1992;

6. Having Myron Lippman, Lippman Engineering Co. (LENCO) or L.I.M.R. and/or any and all persons in active concert with them teach any of the defendants how to manufacture PMMA monofilament until 1992;

7. Soliciting or attempting to solicit any of the doctors listed on Appendix A hereto as customers and/or shareholders of [ETI] until 1988;

8. Soliciting or attempting to solicit any of the hospitals and/or clinics listed on Appendix B hereto as customers of [ETI] until 1988;

9. Soliciting or attempting to solicit any of the doctors and/or customers listed below from working or cooperating with [ETI] and its officers, directors, employees, agents and those acting in concert with them from designing, developing and/or manufacturing the products indicated below:

---

| Name | Product |
| --- | --- |
| Richard Lindstrom | Surgical Viscous Adjunct |
| Richard Lindstrom | Super Balanced Salt Solution |
| L.G. Leiske | Posterior Chamber Lens |
| Evan Jones | In the Bag Lens |

10. Designing, developing and/or manufacturing any Surgical Viscous Adjunct for a period of two years; and

11. Selling any IOLs made by any of the defendants for a period of nine months.

Plaintiff subsequently amended its proposed form of injunctive relief in certain material respects, as discussed in this memorandum.

By order dated May 22, 1986, the Court entered a partial injunction pending final judgment in the case. This memorandum and order incorporates findings of fact and conclusions of law as required by rule 65 of the Federal Rules of Civil Procedure.

**The Intraocular Lens Industry**

Both Surgidev and ETI are engaged in the manufacture and sale of IOLs—medical devices implanted by ophthalmologists in the human eye to correct vision loss resulting from removal of the eye's natural crystalline lens during cataract surgery. A cataract is a progressive clouding or opacification of the eye's natural lens which obstructs the passage of light and impairs vision. The lens is a transparent structure located behind the iris and the pupil. Together with the cornea, the outermost or external segment of the eye fronting the iris, the lens focuses images onto the retina, the light sensitive tissue that lines the inner rear portion of the eye. Opacification of the lens is an irreversible process occasioned by loss of the lens' water content. There are three major classes of cataracts: those induced by the natural process of aging (approximately ninety percent of all cataracts), congenital cataracts, and cataracts induced by trauma.

Since at least the mid–1950's surgical removal of the opacified lens and implantation of an artificial lens has been an accepted technique for treatment of cataracts.[1] The IOL implantation technique was pioneered by Dr. Harold Ridley, an English ophthalmologist. During World War II, Ridley treated British aviators who sustained injuries when fragments of cockpit canopies penetrated their eyes. These canopies were constructed of polymethylmethacrylate (PMMA). Ridley concluded that the PMMA was inert within body tissue. Thereafter, Ridley developed a method whereby an opacified lens may be surgically removed and replaced with an artificial lens composed of PMMA. Due to technical setbacks, the implantation technique did not immediately gain widespread acceptance, and until the mid–1970's cataract spectacles and contact lenses were the preferred methods of treating cataracts. Since that time, however, medical acceptance of IOL implantation has increased steadily, due primarily to Food and Drug Administration (FDA) approval of new IOL designs, improved microsurgical techniques, and the fact that implantation represents a lesser intrusion on the patient's lifestyle than do spectacles or contact lenses. Unlike spectacles and contact lenses, IOLs require no maintenance and do not magnify vision or obstruct peripheral vision. Today, ninety-four percent of all cataract patients are treated with IOL implantation.

The most common technique for performing IOL implantation is known as extracapsular extraction, or ECCE. In an ECCE operation the surgeon removes the anterior or front portion of the lens capsule and lens cortex and nucleus while leaving the posterior or rear portion of the capsule intact. A less common technique is intracapsular extraction, or ICCE, whereby the entire lens, including its surrounding cap-

1. The discovery of IOLs was succinctly summarized in *Public Citizen Health Research Group v. FDA,* 539 F.Supp. 1320, 1324 (D.D.C.1982):

IOLs are tiny clear disks that surgeons implant in patients' eyes to correct vision following removal of cataracts. The concept is not new. During World War II, British surgeons discovered that bits of plastic airplane canopy embedded in the eyes of downed airplane pilots had remained inert there. Prompted by these findings, they were moved to devise the first IOLs. . . .

sule or "bag" is removed. While ICCE surgery was the predominant procedure in the infancy of IOL implantation surgery, today in excess of seventy-five percent of all implants are accomplished by the ECCE method.

IOL implantation may be either primary—simultaneous extraction of the opacified lens and implantation of an artificial lens—or secondary—implantation of an artificial lens in a patient whose natural lens has been removed on some prior occasion. In 1984, of the approximately 800,000 cataract operations performed nationwide, 100,000 involved secondary implantation and the remainder were primary implants.

All IOLs are composed of a central optic, the actual artificial lens through which light passes, and some variation of haptic, a support system which permits the optic to be securely fastened within the human eye. Lenses are manufactured by one of four methods: the lathe cut method, the injection molding method, the cast molding method, or the compression molding method. The central optic is typically composed of PMMA, although some manufacturers use other materials. The haptic may also be composed of PMMA or, more commonly, of polypropylene. Whether PMMA or polypropylene is preferable as haptic material is a debate which continues to rage among ophthalmologists and among IOL manufacturers. In any event, it is clear that several manufacturers, including Surgidev, market lenses with PMMA haptics. In order to manufacture an IOL with PMMA haptics the manufacturer must either purchase or extrude PMMA monofilament. PMMA monofilament is a very fine thread of the PMMA polymer, akin to a plastic fishing line, with a diameter of less than one ten-thousandths of an inch. The process for extruding PMMA monofilament was developed by Surgidev founder Myron Lippman. Prior to Lippman's innovation, IOL haptics were made of platinum radium wire or titanium. The Lippman method for extrusion of PMMA monofilament is accomplished by first melting or dissolving PMMA pellets, then extruding the dissolved PMMA through a "spinnerette," and

finally stretching the PMMA at elevated temperatures and winding it on a spool. PMMA pellets are commercially available from at least two suppliers, Rohm and Haas and Imperial Chemical Company, and several manufacturers offer PMMA monofilament for commercial sale, including Polyoptics and Reliable Engineering, a subsidiary of CooperVision. In addition, some IOL manufacturers, including Surgidev, make their own PMMA monofilament.

A recent event in IOL manufacture is the development of blue-tinted PMMA haptics. A dye or pigment is introduced into the extruded PMMA to give it a blue tint, which has the salutary effect of making the haptic more easily visible to the surgeon during implantation. The blue PMMA haptic was first developed by IOL-ab, Inc., an IOL manufacturer, and subsequently has been copied by other manufacturers including Surgidev.

The earliest mass-manufactured lenses were primarily anterior chamber lenses designed for implantation in the front or anterior segment of the eye. The advantages of anterior implantation included reduced likelihood of lens dislocation, a lesser chance of post-operative inflamation, and the fact that the anterior surgical technique is a simpler procedure than is posterior implantation. Generic anterior chamber lenses which enjoy widespread popularity include the Leiske lens, the Choyce Mark IX lens, the Simcoe C-loop lens, and the Shepard Universal lens. In recent years, however, the IOL industry has witnessed a dramatic shift away from anterior lens implantation in favor of posterior lens implantation, primarily due to the introduction of compressible posterior chamber IOLs which, although technically more difficult to implant, involve a lesser intrusion to the natural anatomy of the human eye. The shift toward posterior implantation has also been spurred by the present preference among ophthalmic surgeons for ECCE surgery, discussed above. Posterior chamber IOLs are typically implanted in those patients who have undergone ECCE surgery, whereas, for patients subjected to ICCE

surgery, anterior implantation is the preferred method, although either anterior or posterior implantation is technically feasible in an ICCE procedure. In 1973 less than ten percent of all IOL implantations were posterior chamber implantations. By 1982 the number of posterior implantations nearly equalled the number of anterior implantations, and by 1985 nearly eighty-five percent of all implantation surgeries were posterior chamber implantations. Generic categories of posterior chamber IOLs which have gained a significant foothold in the industry include the Simcoe C-loop, the Sinsky/Kratz J-loop, the Lindstrom modified J-loop, and the modified Simcoe C-loop. Other recent innovations in the industry are the development of ultraviolet radiation absorbing lenses (UV-additive lenses) which prevent possible retinal damage due to solar exposure, and the development of monolithic or one-piece lenses formed on a panographic lathe.

The market for artificial IOLs has experienced dramatic growth. In 1973 approximately 14,000 lenses were implanted at a dollar volume of $1.7 million. By 1979 the number of lens implantations in the United States had grown to nearly 200,000 at a dollar volume of $41.3 million, and in 1985 some 1.1 million lenses were implanted at a dollar volume in excess of $225 million. The vast majority of IOL implantations are performed on elderly patients suffering from opacification caused by aging. Ninety percent of all IOL implants are subject to Medicare reimbursement. The implementation of medical cost containment measures such as diagnostic related groups (DRGs) has exerted significant downward pressure on IOL prices. While in the past it was not untypical for a hospital or clinic to mark up IOLs for resale anywhere from fifty to three hundred percent, under the DRGs the maximum mark up is expected to be twenty percent or less. Accordingly, while at present IOLs are sold by manufacturers to hospitals or clinics in a price range of $100 to $300, due to increasing price competition in the industry these figures have experienced a steady decline. In addition, the explosive growth in the market has flattened to an annual rate of less than ten percent. One leading analyst has predicted that the rate of increase in the IOL market will decelerate from a 1985 rate of twelve percent per annum to a two percent rate by 1990, resulting in an overall stagnation of lens sales from the 1985 figure of 1.03 million to a projected 1990 figure of 1.15 million. Defendants' Exh. 181 at 3.

As noted above, the IOL market at present is marked by a significant trend away from anterior lens implantation and toward posterior lens implantation. The market for anterior chamber lenses has experienced a corresponding decline. The industry has also experienced a trend away from hospital implantation in favor of implantation in clinics or on an outpatient basis, due primarily to the cost pressure exerted by DRGs. Presently some sixty-five percent of all implants are performed in hospitals, twenty percent are performed on an outpatient basis, and fifteen percent are performed in clinics.

The primary "customers" of IOL manufacturers are the implanting ophthalmologists, hospitals and/or clinics, and institutional "buying groups." While in the past the implanting ophthalmologist typically made the lens-buying decision, the recent trend toward price competition in the industry has caused institutional purchasing agents and administrators to play a larger role in the lens-buying decision. In addition, many smaller hospitals/clinics have banded together into "buying groups" for the purpose of obtaining volume price discounts. Buying group purchasing agents and administrators are assuming an ever-increasing role in IOL purchase decisions.

At present, some seventeen to twenty manufacturers vie for supremacy in the IOL marketplace, including: American Medical Optical (AMO), Cilco, Coburn, CooperVision, Copeland, Intermedics, IOLab, Ioptex, McGhan, Optical Radiation Corporation (ORC), Precision-Cosmet, Surgidev, Storz, and STAAR Surgical. In addition, a number of European competitors are active in the world market including Rayner

(U.K.), Schmidt-Morcher (Germany), and Titmus (Switzerland). Of these, the six largest, IOLab, Cilco, Intermedics, Precision-Cosmet, AMO and ORC, occupy in excess of eighty percent of the United States market. The industry is not technology intensive and has been characterized by low barriers to entry, leading to a flood of new competitors in recent years. The industry has been extremely dynamic, with rapid shifts in market share among manufacturers based on such factors as new product innovation, sales and marketing expertise, and servicing capacity. Some 500 to 600 lens styles are offered in the marketplace. The rate of technical obsolescence in the industry is high, with the average lens enjoying a market life cycle of two to four years. In excess of 5,000 ophthalmologists are certified to do implantation surgery, at some 10,000 hospitals and clinics. Of the ophthalmologists certified to do implants, some ten percent of them, the "high volume" implanters, do sixty to seventy percent of all implantations.

### Surgidev

Surgidev was founded by Myron Lippman in 1976. Lippman is an electrical engineer who corroborated with Dr. Dennis Shepard in the development of McGhan Medical, one of the first IOL manufacturers in the United States. Lippman developed the technology to manufacture IOLs based on his study of European manufacturing facilities. Lippman on behalf of McGhan purchased molding machines from Germany, modified the machines, created fixtures for attaching haptics to PMMA optics, and independently developed a process for the extrusion of PMMA monofilament. In 1976 Lippman left McGhan and founded Surgidev. From 1976 to 1979 Lippman was president, director, and majority shareholder of Surgidev. By 1979 Surgidev had annual IOL sales in excess of $1 million.

In 1979 Lippman sold eighty percent of Surgidev stock to Dennis Grendahl. Grendahl had extensive experience in the medical products field, primarily as a sales rep-

resentative. Grendahl was introduced to Lippman and Surgidev by Robert Fitzsimmons, with whom Grendahl had previously worked when both men were employed in the medical products division of Minnesota Mining and Manufacturing (3M). Fitzsimmons became familiar with the emerging IOL industry while serving as a manufacturer's sales representative for IOLab, in connection with his work as the head of a manufacturer's representative company called Midwest Medical Specialties. When Grendahl inquired of possible development ideas in the medical products field, Fitzsimmons introduced him to Lippman. Through his work in the field Fitzsimmons was aware that Lippman was looking for someone with sales and marketing expertise to purchase a controlling interest in Surgidev. Grendahl and Lippman were able to come to terms and in November, 1979, executed a contract for transfer of eighty percent of Surgidev stock at a price of $1.12 million. Fitzsimmons cosigned a promissory note on behalf of Grendahl. At a subsequent date Fitzsimmons acquired four percent of Surgidev's stock at a price of $16,000.

From the date of sale through October, 1982, Grendahl, Lippman and Fitzsimmons worked to transform Surgidev into a leading competitor in the IOL marketplace. Grendahl acted as chief executive officer of Surgidev based in the company's Minneapolis, Minnesota sales and administrative headquarters. Fitzsimmons acted as vice president of marketing and sales, also based in Minneapolis. Lippman acted as president of the company with primary responsibility for Surgidev's Santa Barbara, California manufacturing facility. Surgidev's sales rose from just over $1 million in 1979 to $14 million in 1982. Surgidev was able to carve out a dominant position in the anterior lens market, primarily due to its development of the Leiske style 10 anterior chamber lens. In addition, Surgidev was first in the field with IOLs composed completely of PMMA. While most manufacturers had PMMA optics, Surgidev was the first to develop PMMA haptics, made of extruded PMMA monofilament.

Surgidev's rapid rise was blunted by many factors, among them the forced exodus of Lippman in October, 1982. In 1980, while acting as president of Surgidev, Lippman was instrumental in the formation of Americal, a California-based IOL manufacturer whose primary focus at the outset of its operation was international sales. When Americal entered the American market in 1982 at least some of Surgidev's patrons switched their allegiance to Americal, with a corresponding decline in Surgidev sales. Grendahl formed the opinion that Lippman had betrayed Surgidev by forming a competitor corporation while still in Surgidev's employ. In addition, Lippman pledged a $500,000 treasury bill belonging to Surgidev as collateral for a personal loan, without informing Grendahl of his intention to do so. When Grendahl became aware of this corporate misappropriation in October, 1982, he terminated Lippman as president of Surgidev, effective October 27, 1982.

Two weeks prior to Lippman's termination, on October 13, 1982, Lippman and Surgidev had entered into an agreement whereby Lippman transferred to Surgidev the process which he had pioneered for extrusion of PMMA monofilament. This manufacturing process had not been among the assets transferred in the 1979 sale of Surgidev stock to Grendahl. The Lippman-Surgidev "Deal Memo" (the name given to the October 13, 1982 agreement) became the subject of a lawsuit initiated by Surgidev against Lippman shortly following Lippman's termination. The Lippman-Surgidev litigation took place in California courts and was concluded by the entry of a settlement agreement (hereinafter "Lippman settlement") in February, 1986. Surgidev subsequently amended paragraphs 3–6 of its proposed preliminary injunction to correspond with the terms of the Lippman settlement, and defendants have expressed their intention to abide by the terms of the Lippman settlement.

From 1982 through 1985 Surgidev experienced a gradual flattening of sales growth. As noted above, during this period the industry witnessed a dramatic shift from anterior to posterior implantation. While Surgidev had a strong array of anterior chamber lenses, it lagged behind its competitors in the development of posterior chamber lenses. In addition, due to the fact that many of Surgidev's competitors were successful in replicating Surgidev's popular Leiske style anterior chamber lens, the competition for anterior lens sales stiffened. As the trend toward posterior lenses accelerated, many hospitals with unused anterior lenses in inventory returned the lenses to Surgidev for a cash refund, thus occasioning cash flow difficulties for Surgidev. A flurry of accounting and billing errors followed, leading to customer dissatisfaction. Surgidev's former vice president of finance, Daniel Binda, described the state of the company's financial records when he arrived in 1984 as "a mess," Binda Dep. at 51–53; 56–67, and during this period two reputable certified public accounting firms, Deloitte, Haskins & Sells and Ernst & Whinney, were unable to complete financial audits of Surgidev due to the disarrayed state of corporate financial records. Because Surgidev lacked a strong product in the growing posterior chamber field,[2] Surgidev's field sales representatives found it increasingly difficult to generate sales commissions, leading in turn to low morale among the sales force, substantial turnover, and a surplus of inexperienced field representatives. In addition, Surgidev found itself shut out of the expanding UV-additive lens market due to its inability to develop and market a UV-additive lens.

**2.** The impact of Surgidev's failure to develop new products is evidenced by the following entry from a weekly summary report prepared by Joyce Del Pico, a Surgidev field sales representative, for the week ending June 15, 1985:

Lost another bid to Iolab in Sikeston, MO, they did not even have a lower price than us—they just have a Pre-Market Approved lens … I think that this will have a real impact on some of my business since the Iolabe Sinsky is so strong in my territory anyway. *Hope that we have a PRe-Mark. Appr. lens soon also.*
Plaintiff's Exh. 37 (emphasis added).

Sales figures for the period 1982 to 1985 bespeak Surgidev's steady decline. From a peak overall market share of 11.2 percent in 1982 Surgidev fell to a market share of less than six percent in 1985. Surgidev's anterior lens sales declined twenty percent in 1983 and experienced a further decline in 1984 and 1985, leading to a plunge in anterior market share from a peak of 19.4 percent in 1982 to less than ten percent in 1985. Surgidev held a 2.9 percent share of the posterior lens market in 1982. By 1985 Surgidev's market share in the posterior lens arena had shrunk to 2.3 percent. Defendants' Exh. 181 at 19.

Surgidev's decline led to an exodus of key employees, beginning with the resignation of Robert Fitzsimmons in February, 1985. The precipitating event which triggered Fitzsimmons' resignation was Grendahl's implementation of the "Vanguard" marketing program in the latter months of 1984. Vanguard was the brainchild of Surgidev consultants Julian Moody and Gary Janka. Moody and Janka advised Grendahl to concentrate marketing and new product sales on the southern California region, an area where Surgidev traditionally had been weak, and which is perceived to be at the leading edge of new product innovation in the IOL industry. With this purpose in view, Grendahl appointed Fitzsimmons regional director of southern California sales, with a specific directive to increase Surgidev sales in the region from fifty sales per month to three hundred sales per month within a five-month period. While Fitzsimmons expressed initial approval of the Vanguard principle, he found himself unable to carry out the proposed directive, due primarily to a lack of sales representatives and the absence of competitive product in the posterior lens and UV-additive lens fields. When Fitzsimmons urged Grendahl to initiate product development in the posterior lens and UV-additive lens areas, Grendahl responded by saying: "Fitz, you've got a hundred thousand Leiske lenses on the shelf. Go sell them." T. at 768. Frustrated by his inability to move the company forward, Fitzsimmons announced his resignation in February, 1985. Fitzsim-

mons also sold his four percent stock interest in Surgidev to Grendahl for $440,000 at that time.

Thereafter several other key employees departed Surgidev. Each subsequently enlisted with ETI. Frederick G. Kalfon was director of marketing at Surgidev from August 1, 1982 through March, 1985, when his title was changed to director of sales support and communication. Kalfon resigned from Surgidev effective June 7, 1985. Kalfon is currently vice president of marketing and sales for ETI. Debra J. McCoy was a Surgidev field sales representative from September 14, 1981 through May 31, 1983, and was Surgidev's manager of manpower development from May 31, 1983 through April 1, 1985, when she was appointed southeastern regional sales manager. McCoy resigned from Surgidev effective May 31, 1985. McCoy is currently vice president of public relations and communications for ETI. James A. Greiling was a Surgidev field sales representative from January 2, 1980 through July 31, 1982, when he was appointed north central regional sales manager. Greiling held this position until his resignation August 2, 1985. Greiling is currently vice president of sales for ETI. William E. Fagan was northeastern regional sales manager for Surgidev from September 7, 1982 until his resignation on August 14, 1985. Fagan is currently vice president of sales for ETI. Fagan, a Rhode Island resident, is not a party to this litigation.

In addition, on August 17, 1985 Myron Lippman, founder and former president of Surgidev, entered into a consulting agreement with ETI, pursuant to the terms of which Lippman agreed to:

(a) prepare for ETI a proposed budget and time schedule for the establishment of an IOL manufacturing facility;

(b) consult with ETI on a monthly basis with respect to establishment of an IOL manufacturing facility;

(c) develop new products for ETI.

In return, ETI pledged to compensate Lippman in the amount of $200,000 payable

in four installments of $50,000 each, and to pay a royalty on all new products developed by Lippman for ETI.

**Non-Disclosure Agreements**

While employed at Surgidev, each of the individual defendants, as well as current ETI officers and/or employees Fagan and Lippman, signed non-disclosure agreements. The agreements signed by each of the individual defendants provide in relevant part:

## EMPLOYEE INVENTION AND NON–DISCLOSURE AGREEMENT

This Employee Invention and Non-Disclosure Agreement (the "Agreement") is entered into between SURGIDEV CORPORATION, a California corporation ("SURGIDEV"), and the undersigned EMPLOYEE.

In consideration for the employment or continued employment of EMPLOYEE by SURGIDEV, EMPLOYEE agrees as follows:

. . . .

**1.2 Confidential Information and Trade Secrets.** "Confidential Information and Trade Secrets" means all information, processes, process parameters, methods, practices, fabrication techniques, technical plans, algorithms, computer programs and related documentation, customer lists, price lists, supplier lists, marketing plans, financial information, and all other compilations of information which relate to the business of SURGIDEV and which have not been released by SURGIDEV to the general public.

. . . .

**2. Trade Secrets and Confidential Information.**

**2.1 Acknowledgement by EMPLOYEE.** EMPLOYEE acknowledges that during the term of employment with SURGIDEV, EMPLOYEE will have access to and become acquainted with the Confidential Information and Trade Secrets of SURGIDEV.

**2.2 No Use or Disclosure.** EMPLOYEE agrees not to use or disclose (directly or indirectly) any Confidential Information and Trade Secrets of SURGIDEV at any time or in any manner, except as required in the course of employment with SURGIDEV. The obligations of this Paragraph are continuing and survive the termination of EMPLOYEE's employment with SURGIDEV.

**2.3. Restriction on Documents and Equipment.** All documents and equipment relating to the business of SURGIDEV, whether prepared by EMPLOYEE or otherwise coming into EMPLOYEE's possession, are the exclusive property of SURGIDEV, and must not be removed from the premises of SURGIDEV except as required in the course of employment with SURGIDEV. All such documents and equipment must be returned to SURGIDEV when EMPLOYEE leaves the employment of SURGIDEV.

**2.4 No Disclosure or Use from Others.** EMPLOYEE agrees not to disclose to SURGIDEV or use on behalf of SURGIDEV any confidential information or trade secrets obtained from other companies or persons, and not to bring confidential information or trade secrets of others onto SURGIDEV's premises.

. . . .

**5. Restrictions on EMPLOYEE.**

**5.1 No Competitive Planning.** While employed by SURGIDEV, EMPLOYEE agrees not to undertake any planning for any outside business activity (i) competitive with the work that EMPLOYEE performs for SURGIDEV, or (ii) competitive with the profit unit of SURGIDEV for which EMPLOYEE works.

**5.2 No Hiring of Other Employees.** While employed by SURGIDEV and for five (5) years after that employment ends, EMPLOYEE agrees not to employ or attempt to employ, in competition with SURGIDEV, any of SURGIDEV's other employees who work in any area in which EMPLOYEE has been significantly engaged on behalf of SURGIDEV.

**5.3 No Use of Confidential Information and Trade Secrets.** While employed by SURGIDEV and for ten (10) years after that employment ends, EMPLOYEE agrees not to enter into any employment competitive with SURGIDEV in which the complete fulfillment of the duties of the competitive employment would inherently require EMPLOYEE to reveal or use any of the Confidential Information and Trade Secrets of SURGIDEV learned and obtained by EMPLOYEE while employed by SURGIDEV.

**5.4 No Solicitation of Customers.** While employed by SURGIDEV and for five (5) years after that employment ends, EMPLOYEE agrees not to divert or attempt to divert (by solicitation or by any other means) the customers of SURGIDEV existing at the time EMPLOYEE's employment ends.

*See* Plaintiff's Exhs. 5–11.

The circumstances leading to execution of these non-disclosure agreements by the individual defendants is the subject of some dispute. Robert Fitzsimmons executed the agreement January 7, 1983. Frederick Kalfon, William Fagan, and James Greiling executed agreements on or about February 12, 1983 in connection with a meeting of Surgidev regional sales managers at the Sheraton Park Place Hotel in Minneapolis. Grendahl and Fitzsimmons were also in attendance at the February 12, 1983 meeting. Kalfon, Fagan, and Greiling testified that Hugh Jaeger, corporate counsel for Surgidev, distributed the form agreements at the meeting and instructed everyone in attendance to sign and date the forms and stated that copies would be provided to individual signatories at a later date. Fagan and Greiling also testified that when certain attendees expressed reservations about signing the agreements, Jaeger informed them that the agreements were designed primarily to protect inventions and patents developed at Surgidev's California manufacturing plant, that the agreements would not prevent Surgidev employees from leaving the company and taking work with a competitor, and that the agreements were unenforceable in any event. Others at the meeting, including certain parties unconnected to this litigation, dispute that such statements were made. Greiling testified that it was Steve Downing, a Surgidev regional manager unconnected to the instant litigation, who made a comment on the agreements' unenforceability, and that Jaeger did nothing more than fail to affirmatively disagree with Downing's opinion. Fagan, meanwhile, testified that Jaeger affirmatively stated that the agreements were unenforceable, a contention which Jaeger hotly disputes.

Greiling and Fagan executed the agreements on February 12, 1983. Kalfon executed the agreement a day later, February 13, 1983. Subsequently, each received a copy of the signed agreement.

At the February 12 meeting, each of the regional managers was given blank nondisclosure agreements and instructed to obtain the signatures of each of their field sales representatives. On March 17, 1983 Greiling distributed a copy to Debra McCoy, with instructions to sign and date the form and to return it to him. McCoy at that time was a Surgidev field sales representative in Minnesota and reported to Greiling, regional sales manager for the north central region. McCoy testified that Greiling represented to her that the agreement was unenforceable and was designed primarily to protect inventions and patents developed at Surgidev's California manufacturing plant. Based upon these representations, McCoy signed the agreement on that date.

**ETI**

Following his resignation from Surgidev, Fitzsimmons was contacted by Jonnie Williams, a venture capitalist who had played a role in the formation of several medical products start-up companies. At that time Fitzsimmons had plans to reactivate Midwest Medical Specialties (Midwest Medical), an independent distributor of medical products. Fitzsimmons had taken certain steps toward that end, including the acquisition of leased office space.

Williams learned at a medical convention in Texas that Fitzsimmons was no longer with Surgidev. Aware of Fitzsimmons' influential reputation in the IOL industry, Williams contacted Fitzsimmons and asked him to travel to Sarasota, Florida to discuss new product ideas and a possible joint venture. Fitzsimmons traveled to Florida in mid-March, 1985 and met with Williams and Dr. Francis O'Donnell, an ophthalmologist practicing in St. Louis, Missouri. Williams and O'Donnell had collaborated in the formation of CME–SAT, a video continuing medical education program with which Fitzsimmons had become familiar in connection with his work at Surgidev. At the March 17, 1985 meeting, Williams, O'Donnell, and Fitzsimmons discussed for the first time the possibility of beginning a new IOL manufacturing concern. The impetus for the proposed new IOL company came from O'Donnell and Williams, who were cognizant of the effect of proposed IOL-related DRGs on the IOL marketplace, and in particular, the transformation of the IOL market from one which was cost-insensitive to one which was highly cost sensitive. Williams and O'Donnell proposed to create a company which would manufacture and market mainstream lenses of proven design at significantly reduced prices, utilizing a nationwide direct field sales force. Fitzsimmons expressed interest in the proposed venture, but informed Williams and O'Donnell that due to the non-disclosure agreement which he had signed while at Surgidev, his availability was uncertain. At Williams' suggestion, Fitzsimmons forwarded a copy of the non-disclosure agreement to CME–SAT's corporate counsel, Sam Sears, an attorney with the Boston, Massachusetts law firm of Burns & Levinson. Sears advised Fitzsimmons that the agreement would not prevent him from taking employment with a competing IOL company. Thereafter Fitzsimmons vigorously pursued incorporation and capitalization of ETI. In pursuit of these objectives, the following steps were undertaken:

(a) Raymond Reher, financial officer for CME–SAT, was retained to prepare financial projections for the proposed company, based upon figures and analysis provided to him by Fitzsimmons. Reher completed the projections in April, 1985, and thereafter took a position as vice president-finance of the fledgling concern.

(b) In April, 1985 Fitzsimmons, Williams, and O'Donnell met at the Boston offices of Sam Sears to further discuss the proposed joint venture. The parties made a decision to go ahead with formation of a new IOL company. Sears was retained as corporate counsel and thereafter set about making legal preparations for a public offering of common stock.

(c) On June 20, 1985 an organizational meeting was conducted in St. Paul, Minnesota at the offices of Midwest Medical. In attendance at the meeting were Fitzsimmons, Williams, O'Donnell, Sears, Joseph Schneider, Kalfon, McCoy, and Lippman. After leaving Surgidev Kalfon and McCoy worked as consultants for CME–SAT utilizing Midwest Medical office space leased to them by Fitzsimmons. When they learned of the proposed start-up company they asked to be affiliated with the venture. Lippman had contacted Fitzsimmons earlier in the year with a proposal for a new products joint venture. As plans for ETI were developed Fitzsimmons asked Lippman to consider taking a consulting position with the new company. Items of business discussed at the June 20 meeting included equity distribution, the size of the proposed public offering, employee stock options, the role of Lippman in the new company's development, and a voting trust. A decision was made to forge ahead with incorporation of ETI. Fitzsimmons was appointed president of the company, and Fitzsimmons, O'Donnell, and Sears agreed to act as directors.

(d) ETI was incorporated in Delaware on June 24, 1985. The original shareholders were Fitzsimmons, O'Donnell, and Williams.

(e) ETI entered into employment agreements with Fitzsimmons, (president, CEO, treasurer), Schneider (vice president-operations), Reher (vice president-finance), Kal-

fon (vice president-marketing and sales), McCoy (vice president-public relations and communications), Fagan (vice president-sales), Greiling (vice president-sales), and Bradford C. Webb, a long-time consultant in the IOL field who accepted a position as ETI's vice president-regulatory affairs.

(f) On September 29, 1985 ETI filed with the Securities Exchange Commission (SEC) a preliminary prospectus for 2,415,000 shares of common stock at a proposed maximum offering price of $3.00 per share for a net offering of $7,245,000.

(g) In September, 1985 ETI made a private placement of 200,000 shares of common stock at $1.00 per share for a net additional contribution to capital of $200,000. In order to effectuate the private placement, Fitzsimmons and O'Donnell solicited ophthalmologists familiar with the IOL industry. Ten individuals made purchases of 20,000 shares each. All but one of the private placement investors are practicing ophthalmologists with extensive IOL implantation practices.

(h) On October 30, 1985 ETI filed amendment number one to its SEC registration statement, reducing the number of shares offered from 2,415,000 to 1,725,000, at a proposed maximum offering price of $3.00 per share. The effect of the amendment was to reduce the net offering from $7,245,000 to $5,175,000.

(i) On December 10, 1985, ETI filed amendment number two to its SEC registration statement. Amendment number two changed the form of the offering to 750,000 units, each unit consisting of two shares of common stock, at a per unit price of $4.00 for a net offering of $3 million.

(j) On February 3, 1986 ETI filed amendment number three to its SEC registration statement. Amendment number three changed the form of the offering to 1,000,000 units, each unit consisting of three shares of common stock and a warrant to purchase an additional share of common stock at a price of $2.00 per share. The proposed offering of each unit was $3.00 for a total net offering of $3 million.

(k) The preliminary prospectus filed by ETI included the following disclosure under the heading "Risk Factors":

Five of the seven executive officers of the Company, including Robert J. Fitzsimmons, President, Treasurer and Chief Executive Officer, are former employees of Surgidev Corporation ("Surgidev"), a manufacturer of IOLs. The Company expects to compete directly with Surgidev in the IOL market. While employed by Surgidev, each of these officers signed an "Employee Invention and Non-Disclosure Agreement," the terms of which include extensive prohibitions for lengthy periods of time against the disclosure of Surgidev's "trade secrets," the employment of Surgidev's employees, the use of Surgidev's "confidential information and trade secrets," and the solicitation of Surgidev's customers. Each of these five persons has stated to the Company that he/she does not have trade secrets or confidential information of Surgidev, or, if he/she does, that he/she will not use or disclose to the Company any of such secrets and information. The Company does not believe that any of such persons has violated such agreement as a result of his/her activities on behalf of the Company. Moreover, the Company does not believe that such agreements are enforceable, inasmuch as the provisions of such agreements are contrary to the laws of California which govern the agreements. The Company has agreed with these officers to indemnify and hold harmless each of them against any claim by Surgidev of breach of agreement in connection with his/her activities on behalf of the Company. While the Company is confident that it and such executive officers would prevail in any litigation with Surgidev, in the event Surgidev would be successful in obtaining restraining orders against any of such persons, the operation and management of the Company might be materially and adversely affected. Moreover, prolonged litigation with Surgidev would require executives of the Company to spend significant time in the

litigation process, time which otherwise would be expended on behalf of the Company's affairs.

Myron E. Lippman, a former employee and existing stockholder of Surgidev, and who has entered into an independent contractor agreement with the Company to establish the Company's manufacturing facilities, is presently named in a lawsuit filed by Surgidev. The dispute, however, is not related to Mr. Lippman's proposed activities on behalf of the Company or to the disclosure of any confidential information. See "Management of the Company—Independent Contractor Agreement."

Defendants' Exh. 108 at 6–7.

(1) On February 12, 1986 ETI's public offering "went effective." Shortly thereafter ETI received $2.7 million in net proceeds.

(m) On May 19, 1986 Fitzsimmons, on behalf of ETI, signed a letter of intent with Americal whereby ETI and Americal expressed their mutual intent to effectuate a combination of their businesses. Americal markets and sells in the United States IOLs manufactured in Mexicali, Mexico.

## DISCUSSION

### A. Choice of Laws

■ The jurisdictional basis of the instant case is the diversity jurisdiction of the federal courts, 28 U.S.C. § 1332. In diversity cases the federal courts are bound to apply the choice of law principles of the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co. Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Minnesota choice of law principles dictate that where the conflict is between substantive laws of the states, the better law methodology adopted by the Minnesota Supreme Court in *Milkovich v. Saari*, 295 Minn. 155, 203 N.W.2d 408 (1973) is determinative. However, where the parties by express contractual provisions have designated that the laws of a particular state shall govern disputes arising under the agreement, Minnesota courts have applied the substantive law of the designated state without reference to the *Milkovich* standards. *Medtronic, Inc. v. Gibbons*, 684 F.2d 565, 567–68 (8th Cir.1982), *citing Milliken & Co. v. Eagle Packaging Co.*, 295 N.W.2d 377, 380 n. 1 (Minn.1980); *Combined Insurance Co. of America v. Bode*, 247 Minn. 458, 464, 77 N.W.2d 533, 536 (1956). *See generally* R. Leflar, *American Conflicts Law* § 147 (3d ed. 1977). Here, the non-disclosure agreements included an express California governing law proviso. The Court sees no federal constitutional obstacle to the choice of California law; California clearly has the requisite "significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Medtronic*, 684 F.2d at 568, *citing Allstate Insurance Co. v. Hague*, 449 U.S. 302, 313, 101 S.Ct. 633, 640, 66 L.Ed.2d 521 (1981).[3] Accordingly, California law will govern interpretation of the non-disclosure agreements.

■ As to plaintiff's tort law claims, the trade secrets laws of California and Minnesota are substantially similar. Both states have adopted the Uniform Trade Secrets Act. *See* Minn. Stat. § 325C.01 *et seq.;* Cal.Civil Code § 3426 *et seq.* Before applying the forum state's choice of law principles the Court must initially determine whether a conflict in fact exists, that is, whether the choice of one state's law to

---

3. The Court must determine as an initial matter whether the contacts with the forum state are sufficient to make application of that state's law consistent with due process. *Hime v. State Farm Fire & Casualty Co.*, 284 N.W.2d 829, 833 (Minn.1979), *citing Clay v. Sun Ins. Office, Ltd.*, 377 U.S. 179, 182, 84 S.Ct. 1197, 1198, 12 L.Ed.2d 229 (1964). Here, both Minnesota and California have the requisite contacts. Contractual choice of law provisos are sometimes disregarded by the courts when the results under the laws of the designated state could conflict with the public policy of the forum state. *Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 20 Cal.App.3d 668, 97 Cal.Rptr. 811 (1st Dist.1971); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973); 1 *Milgrim* § 3.02[1] at 3–65 (questioning this principle of law). Here, California and Minnesota laws are sufficiently congruous.

the exclusion of another state's law will be "outcome determinative." *Myers v. Government Employees Insurance Co.,* 225 N.W.2d 238, 241 (Minn.1974). Because California and Minnesota laws are not in conflict, plaintiff's trade secret counts will be analyzed under both California and Minnesota law.

### B. Trade Secrets

Surgidev claims trade secret protection for four categories of commercial information: (1) customer information; (2) IOL manufacturing "know how;" (3) PMMA monofilament manufacturing "know how;" and (4) new products.

In order to make out its trade secret claims, plaintiff, by the preponderance of the evidence,[4] must prove the following elements:

(1) plaintiff is the owner of a trade secret;

(2) plaintiff disclosed the trade secret to defendant; or defendant wrongfully took the trade secret from plaintiff without plaintiff's authorization;

(3) defendant was in a legal relation with reference to plaintiff as a result of which defendant's use of disclosure of the trade secret to plaintiff's detriment is wrongful;

(4) defendant has used or disclosed (or will disclose) the trade secret to plaintiff's detriment; or, defendant who knew or should have known of plaintiff's rights in the trade secret, used such secret to plaintiff's detriment.

*See* 2 *Milgrim on Trade Secrets* § 7.07[1] at 7–126 through 7–136; *Cal Francisco Investment Corp. v. Vrionis,* 14 Cal.

App.3d 318, 92 Cal.Rptr. 201, 204 (1st Dist. 1971); *Diodes, Inc. v. Franzen,* 260 Cal. App.2d 244, 67 Cal.Rptr. 19, 22–23 (2d Dist. 1968); *Eutectic Welding Alloys Corp. v. West,* 281 Minn. 13, 160 N.W.2d 566, 570 (1968). Plaintiff seeks preliminary and permanent injunctive relief. In order to justify issuance of injunctive relief plaintiff must demonstrate that absent such relief it will be irreparably harmed. 2 *Milgrim* § 7.08[1] at 7–183. Here, the irreparable harm alleged by plaintiff is loss of customer goodwill and injury to business reputation.

### 1. Customer Information

Surgidev claims trade protection for the following categories of customer information: (i) the identity of ophthalmologists who implant Surgidev lenses, (ii) the identity of ophthalmologists who implant a high volume of Surgidev lenses, (iii) the lens style preferences of ophthalmologists who implant Surgidev lenses, (iv) the identity of ophthalmologists who have recently converted from another brand to Surgidev brand lenses, (v) the identity of ophthalmologists who do "core" implanting research on behalf of Surgidev, (vi) the identity of institutions which buy a large volume of Surgidev lenses, (vii) the identity of institutions which have recently converted from another brand to Surgidev brand lenses, and (viii) customer price discounting information.[5]

Surgidev seeks an order of the Court enjoining defendants from "soliciting or attempting to solicit any of the doctors listed on [plaintiff's exhibit 53] as customers of EYE TECHNOLOGY until 1988." Exhibit 53 is a compilation of the names of 235

---

**4.** Proof by a preponderance of the evidence is required in a trade secrets case. 2 Milgrim, *Milgrim on Trade Secrets* § 7.07 at 7–126 n. 2.

**5.** Customer contact can be a trade secret since in the sales industry the goodwill of a customer frequently attaches to the employer's sales representative personally. 1 Milgrim § 3.02(1) at 3–25 n. 15, *citing Morrison Metalweld Process Corporation v. Valent,* 97 Ill.App.3d 373, 52 Ill. Dec. 825, 422 N.E.2d 1034 (1981); *Keller v. Graphic Systems of Akron, Inc.,* 422 F.Supp. 1005 (N.D.Ohio 1976) (customer relationships

held to be protectible interests because the trust and confidence placed in the salesman usually does not change despite the fact that the salesman may change employers). Pricing information may also be protectible, *All-State Supply, Inc. v. Fisher,* 252 Ark. 962, 483 S.W.2d 210, 211–12 (1972); *Wessel Co. v. Busa,* 28 Ill.App.3d 686, 329 N.E.2d 414, 416 (1975); *American Eutectic Welding Alloys Sales Co. v. Rodriguez,* 480 F.2d 223, 226 n. 4 (1st Cir.1973); *H.B. Fuller Co. v. Hagen,* 363 F.Supp. 1325, 1329 (W.D.N.Y. 1973).

practicing ophthalmologists and/or medical specialists, prepared by Surgidev for purposes of this litigation. These individuals were selected based on the following criteria:

Category 1—ophthalmologists who implanted sixty or more Surgidev lenses during the period 11/1/84 to 10/31/85 (high volume implanters);

Category 2—ophthalmologists who have recently converted to Surgidev lenses, based on a comparison of lens implants for the periods 6/1/84 to 11/30/84 (control period) and 6/1/85 to 11/30/85 (conversion period) (converting implanters);

Category 3—ophthalmologists who are influential in the profession (influential ophthalmologists);

Category 4—ophthalmologists who have entered into agreements to do "core" implantation research on behalf of Surgidev (core implanters);

Category 5—medical specialists and/or ophthalmologists who have entered into agreements to consult with Surgidev or to engage in new product design and development for Surgidev (consultants);

Category 6—non-medical consultants who have agreed to do research on optics or polymers on Surgidev's behalf (non-medical consultants);

Category 7—Surgidev's medical monitors (medical monitors).

Plaintiff also seeks an order of the Court enjoining defendants from soliciting or attempting to solicit any of the hospitals and/or clinics listed on plaintiff's exhibit 54. Exhibit 54 is a compilation of 173 hospitals and clinics each of which purchased sixty or more Surgidev lenses during the period 11/1/84 to 10/31/85.

### a. Hollingsworth Analysis

Before proceeding to the four-part trade secret misappropriation test set forth above, the Court will analyze Surgidev's claims for protection of "customer information" under the test set forth in *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324 (9th Cir.1980). In *Hollingsworth* the United States Court of Appeals for the Ninth Circuit conducted an extensive analysis of California trade secret law in the context of customer information. The *Hollingsworth* court cited *California Intelligence Bureau v. Cunningham*, 83 Cal.App.2d 197, 188 P.2d 303 (1948) for the proposition that in an action by an employer against a former employee in which the employer seeks to prohibit customer solicitation by the former employee injunctive relief is appropriate where:

(1) the former employee is in possession of trade or business secrets or confidential information, or the like, not readily accessible to others; (2) the former employee solicits the customers of his former employer in a competing business with intent to injure his former employer's business; (3) the former employee solicits the customers of his former employer, who comprise a list of preferred customers whose trade is profitable to a supplier of a service, knowledge of whom is a trade secret and confidential; (4) one concern is usually patronized by a customer and the lists and names and addresses of the customers are considered secret and have the character of property; (5) there is an established business relationship between the customer and the former employer which, unless interfered with, normally continues.

*Hollingsworth*, 622 F.2d at 1330, *citing Cunningham*, 188 P.2d at 306. In applying the five-part *Hollingsworth* test, the fundamental inquiry is "whether in a given case the knowledge gained by an employee is secret and confidential." *Hollingsworth*, 622 F.2d at 1331, *quoting Cunningham*, 188 P.2d at 306. In applying the test, the following principles pertain:

(1) although in most instances where customer information will be protectible as a trade secret all five of the circumstances described above will be present, California law is best viewed as not requiring a plaintiff to prove all five in order to prevail;

(2) it is not essential for the employer to demonstrate that its efforts, as op-

posed to the employee's independent efforts, were principally responsible for development of the customer information, although this is one factor to be considered;

(3) a list of plaintiff's customers may be a trade secret even where the general class of potential customers is obvious and readily accessible.

*See Hollingsworth,* 622 F.2d at 1331–33.

Of the seven categories of individuals included on plaintiff's exhibit 53, only three are subject to *Hollingsworth* customer information analysis: category 1, high volume implanters; category 2, converting implanters; and category 4, core implanters. The remaining categories occupy a relationship with Surgidev other than a vendor-customer relationship and will be separately analyzed.[6]

The first and most significant consideration is whether the customer information is readily accessible to a reasonably diligent competitor. *Hollingsworth,* 622 F.2d at 1332. A finding that the information is readily accessible to competitors indicates that the plaintiff did not reasonably spend a great deal of time or effort compiling that information, and that the plaintiff suffers no injury when a former employee uses the information since he or his new employer could easily discover it from other sources. *Hollingsworth,* 622 F.2d at 1332.

■ The Court finds that the identity of Surgidev's high volume implanters is not readily accessible to others. James Shumate, former president of ORC, testified that the identity of high volume implanters is considered to be confidential in the industry, that while at ORC he did not know the

identity of Surgidev's high volume implanters, and that he would have considered such information to be a valuable asset in marking out competitive strategies. Gene Beckstein, a former executive at Intermedics and at Coburn, stated that while employed at those companies he did not know the identity of Surgidev's high volume implanters. Bradford Webb, an ETI employee, acknowledged that the identity of high volume implanters would be considered proprietary information by most IOL manufacturers. That the identity of a particular manufacturer's high volume customers is proprietary information is evidenced by the elaborate security procedures which many competitors in the industry observe, procedures designed to keep customer information confidential. At Intermedics sales employees are required to sign nondisclosure agreements and are precluded from working for competitors in the sales territory which they have developed while at Intermedics. At ORC all sales information is put on computerized discs and a limited number of persons are given access to those records. Further, at both ORC and Surgidev sales information is distributed on a need-to-know basis. Interestingly, employee agreements which Kalfon, Greiling, and Fagan signed with Surgidev include the following language:

*Proprietary Information includes,* but is not limited to, information contained in or relating to the Company's product designs, tolerances, manufacturing methods, processes, techniques, treatment or chemical composition of material, plant layout, tooling, marketing plans or proposals, and *customer information.*

. . . .

The Court notes that Greiling and McCoy had direct field sales experience prior to their promotion to the managerial ranks, and that Greiling, McCoy, and Fagan all worked closely with Surgidev's field sales representatives in carrying out their duties as regional sales managers (Greiling and Fagan) and manager of manpower development (McCoy). Each of the individual defendants had access to sensitive Surgidev sales records in their managerial capacities.

---

**6.** Defendants argue that even assuming Surgidev's customer information is protectible trade secret information, Surgidev is not entitled to an injunctive relief because (1) none of the individual defendants was employed in a field sales capacity at the time of their departure from Surgidev and thus none of the individual defendants has actual knowledge of Surgidev's customer information, and (2) even assuming that the individual defendants have such knowledge, the information is stale and outdated.

(b) For 360 days after termination of my employment with the Company, I will not attempt to divert any Company business by soliciting, contacting, or communicating with any customers for the Company's products with whom I, or employees under my supervision, had contact during the year preceding termination of my employment.

Plaintiff's Exhs. 13, 14, and 15 (emphasis added).

The fact that competitors in the industry safeguard the identities of high volume customers indicates inferentially that such information is not readily accessible, since quite obviously a company would not protect information which is freely obtainable by legitimate means. Defendants argue that the identity of high volume implanters is readily accessible and cite a vast array of industry sources which a diligent salesperson might consult in an attempt to ascertain this information, including: The Red Book of Ophthalmology, the Directory of the American Intraocular Lens Society, industry analysts' reports such as the Health Products Research (HPR) Report and the Hambrecht & Quist Report, a biannual report produced by Dr. Walter Stark of Johns Hopkins University School of Medicine, various publications concerning the IOL industry, including Ophthalmology Times, the Implant and Refractive Society Journal, the American Journal of Ophthalmology, and lists of ophthalmologists supplied by commercial purveyors of mailing lists. Defendants also claim that a perspicacious industry salesperson could readily obtain this information by making calls on ophthalmologists listed in telephone directories and local yellow pages, by inquiring of hospital personnel including operating room nurses and operating room supervisors, by inquiring of hospital and/or clinic purchasing agents and administrators, and by attending various local, regional, and national medical conventions for the purpose of buttonholing prominent implanting ophthalmologists.

While an industry salesperson might well obtain the identity of implanting physicians in such a manner, such techniques would not necessarily reveal which of these implanters are Surgidev customers. This is the crucial distinction. The identity of potential customers is undoubtedly readily available from public sources. However, parsing from such sources a list of potentially profitable high volume implanters who are known to use Surgidev products would be a costly and time-consuming endeavor. In *Hollingsworth* the following observations were made:

Even if the names of plaintiff's customers appear in a public directory, however, those names may appear among the names of many other businesses which may be neither actual nor even potential customers of the plaintiff. Hence, it may be costly to parse from such a directory potentially profitable customers from entries not worth pursuing. This might be most true of a directory, such as a telephone book, which included diverse entries. Evidence concerning whether a reasonably diligent salesman could perceive a narrowing classification which reduces substantially the costs of identifying potential customers is thus relevant to determining accessibility....

A list of plaintiff's customers may be a secret even when the general class of potential customers is obvious and readily accessible. In *Reid*, ... for example, the court stated:

Defendants argue that the information concerning plaintiffs' customers was not confidential since no lists were furnished to the salesmen and since each salesman used obvious methods in choosing prospective customers— telephone directory, newspaper, driving through a town and picking the best looking stores, et cetera. However, these sources would not disclose the persons who ultimately made up the list of plaintiffs' customers. Some of the merchants approached by plaintiffs' salesmen declined to purchase this type of advertising. It was the list of persons who *did* purchase plaintiffs' services that constituted confidential information.

*Hollingsworth,* 622 F.2d at 1333, *quoting Reid v. Mass Co.,* 155 Cal.App.2d 293, 318 P.2d 54, 60 (1957).

██ The above analysis also applies to categories two and four comprising plaintiff's exhibit 53. Converting physicians are by definition Surgidev patrons. While the identity of implanting ophthalmologists may be generally available, the identity of ophthalmologists who implant Surgidev lenses and who have markedly increased their use of Surgidev lenses during the designated conversion period is not generally available. A core implanter is one who agrees to implant investigational lenses and to complete the required investigational documentation. In order to obtain FDA approval for a proposed new style of lens the manufacturer must first file an investigational device exemption (IDE). This preclinical filing sets forth in detail the manufacturing process utilized, the investigation that the manufacturer anticipates conducting with human subjects, a microbiological study of the materials used in manufacture of the lens, a toxilogical study of the materials, and results of tests of the lens with a tumor inducing device. The FDA then has thirty days in which to approve or disapprove the filing. If the FDA does not act within thirty days the filing is deemed approved and clinical testing commences. Implantation during this clinical period prior to full FDA approval of the lens is called "core" implantation. Ophthalmologists who implant core lenses must complete and file with the FDA various post-operative reports. In return for fulfilling these record-keeping duties ophthalmologists are compensated by the manufacturer. Following this core period, and conditioned on FDA approval, the lens goes on safety adjunct status, pursuant to which full scale marketing and implantation of the lens is permitted. The evidence amply reveals that the identity of doctors who have agreed to do core research for a particular manufacturer is proprietary information not readily accessible to competitors.

██ The second and third considerations set forth in *Hollingsworth* require a show-ing that defendants have solicited customers of Surgidev. The evidence establishes that defendants have solicited Surgidev's high volume implanters and intend to do so in the future. For example, during the interim between their departure from Surgidev and their employment by ETI, Kalfon and McCoy did consulting work for CME–SAT, primarily telephonic solicitation of ophthalmologists. Of the ophthalmologists contacted by McCoy during this period, sixty-five percent were Surgidev customers. Of the ophthalmologists contacted by Kalfon, thirty-six percent were Surgidev customers. In addition, Fitzsimmons solicited ophthalmologists in September, 1985 while pursuing private placement of ETI common stock. Among the ophthalmologists solicited by Fitzsimmons were both of Surgidev's medical monitors, several of Surgidev's high volume implanters, ophthalmologists who are consulting with Surgidev on new products, and Surgidev customers. All but two of the ophthalmologists who purchased ETI common stock in the September, 1985 private placement are Surgidev customers and/or consultants. The Court also finds probative the fact that ETI's two vice presidents in charge of sales, James Greiling and William Fagan, have been assigned sales territories which coincide with the territories covered by them while at Surgidev. Finally, the ETI prospectus states that "[a] major emphasis in [ETI's] business strategy is to establish a strong market presence through an extensive nation-wide direct field sales force. All salespersons will be exclusively employed by [ETI] and [ETI] will hire personnel who have demonstrated previous high performance in the IOL sales field." Defendants' Exh. 108 at 13. ETI's heavy reliance on "experienced" sales personnel gives rise to an inference that these experienced salespersons will use prior customer contacts to initiate sales for ETI. The fact that ETI has chosen to employ only five salespersons, well below the industry average, also indicates inferentially that defendants plan to concentrate their sales efforts on high volume implanters with

whom the salespersons were able to forge beneficial relationships while at Surgidev.

The fourth and fifth *Hollingsworth* factors also support a finding that the identity of high volume implanters and core implanters is protectible. The evidence establishes that most ophthalmologists do not patronize one brand of IOL to the exclusion of all others, and Surgidev admits that it has no exclusivity agreements with any ophthalmologists. However, with regard to high volume implanters, there was at least some evidence of brand loyalty. For example, Dr. O'Donnell testified that he was persuaded to change his allegiance to Surgidev lenses based on the fact that Surgidev's lenses are composed solely of PMMA, and that he has continued to use Surgidev lenses despite the instant litigation. James Shumate testified that while at ORC he attempted to persuade Dr. Larry Leiske to switch his allegiances from Surgidev to ORC but that Leiske remained loyal to Surgidev. Fitzsimmons testified that among the ophthalmologists whom he solicited in connection with the September, 1985 private placement of ETI common stock was Dr. David Pfoff of Denver, Colorado, but that Dr. Pfoff declined Fitzsimmons' offer to invest because, in Fitzsimmons' words: "[h]e told me at that time he was doing *all ORC lenses* and they were making the lens for him." T. at 828 (emphasis added). In addition, plaintiff's exhibit 37 is an excerpt from a weekly summary report prepared well in advance of this litigation by Joyce Del Pico, a Surgidev field sales representative. The report includes the following observation:

> We lost out on an Equipment/Lens Deal with Dr. Posegate in Springfield, his senior partner *refuses to use anything but Intermedics....*

Plaintiff's Exh. 37 (emphasis added). Leiske, O'Donnell, and Pfoff are high volume implanters. Even assuming, however, that brand loyalty is not characteristic of the industry, it cannot be said that a failure of proof as to a single element of the Hollingsworth test defeats plaintiff's

claims. *See Hollingsworth,* 622 F.2d at 1331. The fifth *Hollingsworth* consideration—the existence of an established business relationship—was proved with regard to high volume implanters, inasmuch as high volume ophthalmologists typically continue to implant a given manufacturer's lenses absent some intervening event. As to core implanters, these ophthalmologists are contractually bound to carry out the terms of the core research and thus the presence of an "established business relationship" in that context cannot be disputed.

Turning to category two, however, with certain exceptions, it cannot be said that the converting implanters identified by plaintiff are engaged in an "established business relationship" with plaintiff. Converting ophthalmologists are physicians who have only recently developed an allegiance to Surgidev lenses. Because the ophthalmologist's conversion is recent, it cannot be said that the converting physician has an "established" relationship with Surgidev. The relationship may well be firmly established at some future date, but at present it is a merely formative relationship. Further, the evidence of brand loyalty with regard to these converting physicians is far weaker. Perhaps most importantly, given the fact that these ophthalmologists converted to Surgidev *after* most of the individual defendants had already left Surgidev's employ, it seems unlikely that the individual defendants are aware of the identity of these physicians and even less likely that they will solicit them on behalf of ETI with an intent to injure Surgidev. Fitzsimmons disassociated himself from Surgidev in February, 1985, Kalfon in May, 1985, McCoy in May, 1985, Greiling in July, 1985, and Fagan in August, 1985. The conversion period designated by Surgidev runs from June 1, 1985 to November 1, 1985. During this conversion period the individual defendants had little or no contact with Surgidev and little or no contact with Surgidev's sales records. As to those converting physicians who are on a "pace" to become high volume Surgidev implanters, however, the high volume implanter

analysis detailed above applies. Because these ophthalmologists are on a pace to become high volume implanters, the evidence of brand loyalty is stronger, as is the likelihood that they will be solicited by defendants. Accordingly, relief will be granted as to those converting physicians on a pace to become high volume implanters, as discussed *infra,* but will be denied as to the remaining converting ophthalmologists.

■■■■■ With regard to categories one and four the Court finds that plaintiff has met its burden of proving a protectible trade secret under *Hollingsworth* analysis. Plaintiff has also met its burden as to those category two ophthalmologists on a pace to become high volume implanters. Accordingly, relief will be entered as to these categories of doctors.[7]

A finding that plaintiff is entitled to relief as to the identity of its high volume implanters begs a central question: what volume of implants qualifies an ophthalmologist as a "high volume" implanter? Plaintiff's exhibit 53 includes as high volume implanters all ophthalmologists who implanted sixty or more Surgidev lenses during the period November 1, 1984 to October 31, 1985. James Shumate testified that in his opinion a high volume implanter is one who implants one hundred or more lenses a year. Quite obviously, the designation of a given level of implants as a "high volume" of implants is not subject to mathematical certainty. However, with the policy rationale underscoring the protectibility of customer information in view, and with regard to the public interest in fair and open competition and the need for practicing ophthalmologists to have a full array of competing products at their disposal, the Court finds that ophthalmologists who implant eighty-four or more lenses yearly are "high volume" implanters for purposes of the present litigation. The evidence establishes that while the "average" ophthalmologist implants 100–110 lenses yearly, this figure is somewhat distorted by the fact

that a small universe of "mega-implanters" implants thousands of lenses each year. The median average is six to seven lenses per month, or seventy-two to eighty-four lenses per year. Accepting the higher figure as the median figure, the Court designates eighty-four lenses per year as the cut off point. Category one ophthalmologists who implanted eighty-four or more Surgidev lenses during the time period 11/1/84 to 10/31/85 will be among those as to whom injunctive relief is granted. Injunctive relief will be denied as to all other category one ophthalmologists included on plaintiff's exhibit 53. As to the category two converting ophthalmologists, the Court finds that those converting physicians who implanted forty or more Surgidev lenses during the time period 6/1/85 to 11/30/85 are on a "pace" to become Surgidev high volume implanters. Accordingly, relief will be granted as to all physicians included in plaintiff's category two who implanted forty or more Surgidev lenses during the 6/1/85 to 11/30/85 time period. Relief will be denied as to all other category two ophthalmologists.

### b. Hospitals and/or Clinics

Plaintiff also claims trade secret protection in a list of institutions which have implanted more than sixty Surgidev lenses during the period 11/1/84 to 10/31/85. Plaintiff seeks to enjoin defendants from soliciting these institutions.

■■■■ The Court finds that the identity of these institutions is readily accessible to others in the industry. Accordingly, plaintiff's requested relief will be denied. The evidence overwhelmingly establishes that the identity of institutions which do a high volume of implants is well known within the industry. Each of the testifying ophthalmologists was readily able to identify the institutions that did a high level of implants in the geographic area in which they practice, and were also able to identify which brands of lenses these institutions

---

7. Relief will not be granted, however, with respect to Dr. Richard Fenzl, who is on the list of core implanters. Fenzl is an influential

ophthalmologist whose identity is readily ascertainable. *See* discussion *infra.*

stocked. Institutions which offer cataract surgery typically advertise in the community, and many of the high volume institutions conduct seminars and educational series which are widely advertised in the industry. For example, Mt. Sinai Hospital in Minneapolis conducts a yearly cataract implantation seminar, at which IOL competitors display their wares in an adjoining exhibition area created for that purpose.

The evidence further establishes that these institutions typically carry several brands and styles of lenses for the benefit of the ophthalmologists who practice at the institution. These institutions do not typically patronize only one IOL manufacturer. Ascertaining the identity of the brands and styles which a particular institution carries in stock is a relatively simple matter—at most institutions IOL field sales representatives are permitted access to the storage area for the purpose of inventorying the brands and styles there housed. Unlike the high volume ophthalmologists, it cannot be said that these high volume institutions exhibit any brand loyalty whatsoever.

### 2. IOL and PMMA Monofilament "Know-How" and New Products

The remaining categories of information as to which plaintiff claims trade secret protection are IOL manufacturing know-how, PMMA monofilament manufacturing know-how,[8] and new products. These categories will be analyzed under the four-part trade secret test referenced above. In addition, plaintiff's remaining customer information claims will be analyzed under this heading.

With regard to the IOL and PMMA monofilament manufacturing know-how, plaintiff originally sought an order of the Court enjoining defendants from having Myron

Lippman perform any services on behalf of ETI until October, 1987, purchasing or obtaining PMMA monofilament from Myron Lippman or Lippman Engineering Co., having Myron Lippman or Lippman Engineering Co. make or supply PMMA monofilament until 1992, and having Myron Lippman or Lippman Engineering Co. teach any of the defendants how to manufacture PMMA monofilament until 1992. Following approval of the Lippman settlement, plaintiff amended the form of its requested injunction to conform to the terms of the settlement. Pursuant to the terms of the settlement, Lippman is prohibited from being employed by or performing services for ETI or giving business or technical assistance to ETI with respect to the manufacture of PMMA monofilament, or supplying PMMA monofilament to ETI, directly or indirectly, through April 7, 1987. Because the Court finds that the process for manufacture of PMMA monofilament conveyed by Lippman to Surgidev in October, 1982 is a protectible trade secret, as discussed below, relief will be entered for plaintiff in accordance with the terms of plaintiff's amended proposed injunction.

### a. Trade Secret Ownership

Plaintiff must first prove that it owned trade secrets. Under the Uniform Trade Secret Act (adopted in both California and Minnesota), a "trade secret" is defined as:

[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other

---

**8.** Manufacturing methods and techniques—the technical "know-how" gleaned from experience and repeated practical application—is a proper subject of trade secret protection. *See generally* 1 *Milgrim* § 2.09[3] at 2–164. Processes relating to manufacture or treatment of metals, chemicals, or raw materials have frequently been found to be subject to trade secret protection. *See, e.g., State ex rel. Armour & Co. v. Gulf Sulphur Co.,* 231 A.2d 470 (Del.Sup.Ct.1967)

(process for manufacture of potassium sulfate); *Imperial Chemical Industries, Ltd. v. National Distillers and Chemical Co.,* 342 F.2d 737 (2d Cir.), *modified on basis of new findings of fact on remand,* 354 F.2d 459 (1965) (a high pressure process for the manufacture of polyethylene); *Amberley Co. v. Brown Co.,* 156 U.S.P.Q. 633 (S.D.Ohio 1967), *aff'd,* 408 F.2d 1358 (6th Cir. 1969) (process for recovering polyfilm from cellulose fibers of polycoated broke).

persons who can obtain economic value from its disclosure or use, and

(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Minn.Stat. § 325C.01, subd. 5; Cal.Civil Code § 3426. The statutory definition "more or less" embodies the definition of trade secret adopted under the common law of Minnesota. *Electro-Craft*, 332 N.W.2d at 899. In *Cherne Industrial, Inc. v. Grounds & Associates, Inc.*, 278 N.W.2d 81 (Minn.1979) the Minnesota Supreme Court adopted the four-point test of the Restatement, Torts § 757: to be a trade secret the information must (1) not be generally known or readily ascertainable, (2) provide a competitive advantage, (3) have been developed at plaintiff's expense, and (4) be the subject of plaintiff's intent to keep it confidential. *See Cherne*, 278 N.W.2d at 90; *Electro-Craft*, 332 N.W.2d at 898–99; *Jostens, Inc. v. National Computer Systems, Inc.*, 318 N.W.2d 691 (Minn.1982). *See United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 638 (Minn.1982) (the statutory definition of trade secret mirrors the common law definition set out in *Cherne* ).

### (1) Not Generally Known or Easily Ascertainable

Matters which are generally known or which are commonly known in the trade in which the putative trade secret owner is engaged cannot be considered trade secrets. 1 *Milgrim on Trade Secrets* § 2.07[1] at 2–127; *Aetna Building Maintenance Co. v. West*, 39 Cal.2d 198, 246 P.2d 11, 16 (1952).[9] Information is readily ascertainable if it is available in trade journals, reference books, or published materials, 14 Uniform Laws Annotated, Uniform Trade Secrets Act, § 1 Commissioner's Comments, or if the putative trade secret can be ascertained by "proper means," including *inter alia:*

1. discovery by independent invention;

2. observation of the item in public use or on public display;

3. obtaining the trade secret from published literature.

*Id.; see also Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890 (Minn.1983) (requirement for a trade secret that information sought to be protected must not be generally known or readily ascertainable is satisfied if the information is not quickly available through proper means); *Steenhoven v. College Life Insurance Co. of America*, 458 N.E.2d 661 (Ind. App.1984) (no trade secret protection where information readily ascertainable). Courts agree that trade secrets lie somewhere on a continuum from what is generally known in a field to what has some degree of uniqueness, although there need not be the degree of novelty or originality required for patent or copyright protection. *Jostens*, 318 N.W.2d at 698, *citing Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315 (1974). The requirement that trade secret information not be readily ascertainable does not mean that the owner of the trade secret must be the only one in the market. Several developers of the same information may have trade rights in that information. *Electro-Craft*, 332 N.W.2d at 900, *citing* Uniform Trade Secrets Act § 1, Commissioner's Comment, 14 U.L.A. 542–43 (1979). If an outsider would obtain a valuable share of the market by gaining certain information, then that information may be a trade secret if it is not known or readily ascertainable. *Electro-Craft*, 332 N.W.2d at 900.

### (a) Not Generally Known—PMMA Monofilament

■ The Court finds that the Lippman method for manufacture of PMMA monofilament is not generally known or easily ascertainable. As noted above, Lippman independently originated the process for extruding PMMA monofilament in 1976. While the concept is broadly understood by those in the industry, particular techniques for manufacturing PMMA monofilament

---

**9.** Commentators have recognized that this first "element" of the trade secret definition may also properly be characterized as an affirmative defense. 1 *Milgrim* § 2.07[1] n. 6.

are jealously guarded trade secrets. Dr. Phillip H. Geil, a professor of polymer science and engineering at the University of Illinois and a renowned expert in the field, testified that the Lippman process for manufacture of PMMA monofilament is unique, that the process could not be gleaned from an analysis of industry sources,[10] and that the monofilament produced by the Lippman method is superior to monofilament produced by at least some commercial manufacturers. Of course, the fact that PMMA monofilament is commercially available from other sources is irrelevant for present purposes inasmuch as plaintiff seeks an order prohibiting defendants from acquiring PMMA monofilament from Lippman, not an order prohibiting defendants from acquiring PMMA monofilament from sources other than Lippman.

### (b) Not Generally Known—IOL Manufacturing Know-How

The Court finds that Surgidev's IOL manufacturing know-how is not a protectible trade secret in that such information is generally known or easily ascertainable. Dennis Grendahl admitted in his testimony that the IOL marketplace is a "knock off" marketplace in which competitors freely reverse engineer one another's lenses. Various industry analysts have characterized the IOL industry as a non-technology intensive industry with low barriers to entry, in which new manufacturers are able to replicate existing lenses and thereby gain quick market acceptance. For example, ORC entered the IOL marketplace with its first core implants in July, 1981, and was quickly able to gain an eleven percent share of the market. The industry is characterized by several "generic" styles of lenses, as for example, the Simcoe C-loop, the Sinskey/Kratz J-Loop, the Lindstrom modified J-loop, and the modified Simcoe C-loop. Manufacturers of a Simcoe C-loop style lens include: American, AMO, Cilco, Coburn, CooperVision, Copeland, Intermedics,

IOLab, Ioptex, ORC, Pharmacia, Precision-Cosmet, STAAR Surgical, Storz, and Surgidev. Manufacturers of a Sinskey/Kratz J-loop style lens include American, AMO, Cilco, Coburn, Cooper-Vision, Copeland, Intermedics, IOLab, Ioptex, ISP, ORC, Pharmacia, Precision-Cosmet, STAAR Surgical, Storz, Surgidev, and 3M. Dr. O'Donnell testified that the similarity of lens styles among the major manufacturers is such that the quality of design of a particular manufacturer's lenses is not a major factor in the typical ophthalmologist's buying decision. The evidence indicates that Surgidev has on many occasions in the past considered "knocking off" a competitor's lenses. Defendants' exhibit 38 is a letter to Grendahl from a research and development specialist at Surgidev suggesting that Surgidev replicate a lens introduced to the market by McGahn. Defendants' exhibit 39 is a similar letter written by Grendahl suggesting that Surgidev duplicate a "sheet" style lens introduced by 3M. Defendants' exhibit 40 is another letter from Grendahl in which he suggests that Surgidev's design experts duplicate a McGahn "sheet" lens. James Greiling testified that when he suggested to Grendahl that Surgidev develop a posterior lens with a flexible haptic in order to offset modified Sinskey lenses offered by competitors, Grendahl responded by stating that Surgidev would let IOLab develop such a lens and that Surgidev would then copy it. T. at 617. Defendants' exhibit 62 is a letter to Grendahl from a Surgidev design engineer in which the engineer proposes chemical analysis of competitors' UV-additive lenses. In an industry where lens styles are so easily duplicated, it cannot be said that Surgidev's lens manufacturing know-how is a protectible trade secret.

### (c) Not Generally Known—New Products

Surgidev seeks an order of the Court prohibiting defendants from soliciting cer-

---

**10.** Disclosure in technical publications of the general elements of a protected process in such detail as to permit one skilled in the art to devise the subject matter terminates secrecy. 1 *Milgrim* § 2.05[2] at 2–59. Here, the uncontro-

verted testimony of Dr. Geil establishes that industry literature is not of such a detailed nature as to permit free duplication of the Lippman PMMA monofilament process by one skilled in the art.

tain ophthalmologists to develop certain new products on ETI's behalf, including:

| Ophthalmologist | Product |
|---|---|
| Richard Lindstrom | surgical viscous adjunct |
| Richard Lindstrom | balanced salt solution |
| L.G. Leiske | posterior chamber lens |
| Evan Jones | "in the bag" lens |

Plaintiff claims that it has conducted negotiations with each of these doctors as to each of these products, that these negotiations are secret, that the very existence of these new product developments is a trade secret, and that the individual defendants learned of the new products while at Surgidev and have an intention to misappropriate these new product ideas.

■■■ The Court finds that plaintiff is not entitled to trade secret protection as to the enumerated new product ideas. The evidence overwhelmingly establishes that surgical viscous adjunct and balanced salt solution are well known medical products which have been on the market for years. Surgical viscous adjunct is a viscous or thick fluid which is injected into the anterior segment of the eye during surgery in order to protect the corneal endothelium and other sensitive eye cells. Surgical viscous adjunct was first developed by Pharmacia in the 1960's under the trade name Healon. At present, at least three manufacturers produce surgical viscous adjunct, including Pharmacia, Precision-Cosmet, and Cilco. Dr. Lindstrom testified that he is working to develop a new and improved surgical viscous adjunct and that he has negotiated with Surgidev with regard to licensing of the product. Lindstrom further testified, however, that he has negotiated with six other companies regarding his surgical viscous adjunct, that negotiations have gone beyond the preliminary stage with three of these companies, that he has no binding contractual arrangement with Surgidev, and that while he intends to negotiate in good faith with Surgidev, he does not feel bound to the company in any way. Balanced salt solution is used to irrigate the eye during cataract surgery. Lindstrom is developing a new and improved balanced salt solution, but to date has not entered into a binding agreement to license the product to Surgidev when developed and stated that he does not feel bound to license the product to Surgidev. Several other companies manufacture and market balanced salt solution.

The evidence also establishes that Surgidev hopes to obtain but has not yet obtained licensing agreements with Dr. Leiske for a posterior chamber lens and with Dr. Jones for an "in the bag" lens. Each of these products is well known in the industry, and the fact that developmental projects are under way as to these products is readily known or easily ascertainable. Surgidev cannot claim trade secret protection as to these new products.

■■■ Of course, to the extent that Surgidev is able to enter into binding agreements with the enumerated ophthalmologists with respect to the enumerated new products, it is entitled to relief. The relief is not a product of trade secret law, however, but is a simple matter of contract enforcement. Accordingly, the Court will enter an order prohibiting defendants from soliciting the named ophthalmologists with respect to the named new products, but only to the extent that Surgidev has valid and binding contractual arrangements with these ophthalmologists as to these products.[11]

### (d) Not Generally Known—Remaining Categories of Customer Information

#### (i) Influential Ophthalmologists

■■■ Plaintiff's exhibit 53 is composed in part of a list of "influential ophthalmologists." These are implanting ophthalmologists who, due to their educational and professional qualifications and status in the profession, exert influence on the rank and file of implanting ophthalmologists. Plain-

---

11. Fitzsimmons testified that neither he nor anyone at ETI has any intention of interfering with a competitor's contractual arrangement, and that he could not expect to remain long in the industry if he did engage in such conduct.

tiff originally claimed that the identity of these influential implanters was a protectible trade secret and sought an order of the Court prohibiting defendants from soliciting them on behalf of ETI.[12] Plaintiff later withdrew its request for relief as to this category of ophthalmologists. Should the issue again arise, the Court notes that the identity of influential ophthalmologists is generally known or easily ascertainable. An influential physician is one who is well known and respected in the industry. Influential ophthalmologists write professional papers, speak at conventions and seminars, and instruct at the nation's leading medical schools. For example, Dr. M.B. Abelson, Dr. Randall Bellows, Dr. William Cain, Jr., Dr. Robert S. Coles, Dr. John E. Gilmore, Dr. Jack Hartstein, Dr. Lawrence Hirst, Dr. John Huenkler, Dr. Stephen H. Johnson, Dr. Peter Larson, Dr. Thomas Leisegang, and Dr. George Waring are well-known authors of articles regarding ophthalmology and IOLS. *See* Defendants' Exhs. 97, 4, 137, 21, 21, 85, 86, 32, 94, 33, 58. Dr. William Ellis is a well-publicized director of a seminar on radial keratomy. *See* Defendants' Exhs. 85, 86. Dr. Robert Fenzl is well known throughout the industry as the designer of a particular style of IOL haptic. Defendants' Exhs. 21, 32, 33, 85, 86, 94, 96. Dr. Richard P. Kratz is well known throughout the industry as the designer of a particular style of IOL haptic. Defendants' Exhs. 21, 32, 85, 86, 94, 96, 134. Dr. Richard L. Lindstrom is well known throughout the IOL industry as an author of papers, articles, and as a professor at the University of Minnesota Medical School. T. at 133–36, 158–60; Defendants' Exhs. 14, 18, 20, 21, 32, 85, 86, 94, 96, 97, 136, 138.[13]

### (ii) Consultants and non-medical consultants

Plaintiff's exhibit 53 includes five individuals designated as consultants and/or non-medical consultants. These individuals are and have been engaged in a longstanding business and contractual relationship with Surgidev with respect to IOL research and development. The fact of these relationships is not generally known or readily ascertainable. The other aspects of the trade secret test have been met as to this category of individuals as well. Accordingly, defendants will be prohibited from soliciting these individuals, with the exception of Dr. Perry Binder, who is an ETI shareholder, and Dr. George Waring, who became a Surgidev consultant after defendants departed Surgidev.

### (iii) Medical Monitor

Dr. Richard Lindstrom acts as the Surgidev medical monitor. In this capacity, Dr. Lindstrom advises Surgidev on an ad hoc basis, and responds to questions which are raised by other implanting ophthalmologists with respect to Surgidev products. The elements of the trade secret test have been met with respect to Dr. Lindstrom in his role as Surgidev medical monitor. Accordingly, relief will be granted as to Dr. Lindstrom.

**12.** Plaintiff does not claim protection based on the status of these ophthalmologists as Surgidev customers per se, although most of them are Surgidev customers, but rather based on their reputation in the industry. As such, *Hollingsworth* analysis is not appropriate as to this category of ophthalmologists, although as a practical matter the result would be the same since under either test plaintiff must establish that the information is not easily accessible.

**13.** Some of these ophthalmologists are also high-volume implanters of Surgidev lenses. While plaintiff may not claim that the identity of these ophthalmologists is protectible based on their reputation in the industry, plaintiff may claim protection to the extent these influential physicians are Surgidev's high-volume customers. It is generally known in the industry who the influential ophthalmologists are and Surgidev has no right to claim that the identity of these doctors is a trade secret. However, it is not generally known to what extent these influential ophthalmologists are high-volume patrons of Surgidev. Merely reading articles and attending seminars would not reveal this information. Thus, as to those ophthalmologists who implant eighty-four or more Surgidev lenses during the designated time period, defendants will be enjoined from soliciting them, notwithstanding that some of these ophthalmologists are also on the list of influential ophthalmologists.

### (2) Provide a Competitive Advantage

The second element of the trade secret definition requires proof that the information provides a competitive advantage. If the idea of another saves a person who has wrongful knowledge of it time and money, such person has been materially benefited and the information has economic value. 1 *Milgrim on Trade Secrets*, § 2.02[1] at 2–21. *See also Cudahy Co. v. American Labs, Inc.*, 313 F.Supp. 1339 (D.Neb.1970) (absent showing that putative trade secret afforded a distinct competitive advantage court could not find a trade secret).

■ The Court finds that Surgidev's ownership of the Lippman PMMA monofilament process provides a competitive advantage. Defendants do not dispute that ownership of the process benefits Surgidev and that independent development of the process would be a costly and time-consuming endeavor.

■ The Court also finds that the identity of Surgidev's high volume implanters, core implanters, certain of its list of converting physicians, its consultants and nonmedical consultants, and medical monitor are valuable assets which provide a competitive advantage. The fact that defendants have exhibited an intention to use this information, as discussed above, is circumstantial proof of its value. There would be little purpose in using the information if defendants did not believe the information was valuable. *See Cherne*, 278 N.W.2d at 90.[14]

■ The third element of the trade secret definition requires proof that the information was developed at plaintiff's expense. No rigid guidelines for ascertaining the requisite level of expenditure have emerged. However, the courts have recognized that information developed at great expense will be "most eligible for favorable judicial trade secret recognition and enforcement," while "marginally protectable" information may not be the subject of judicial protection if plaintiff's expenditures were minimal. 1 *Milgrim on Trade Secrets* ¶ 2.02[2] at 2–30. *See generally Components for Research, Inc. v. Isolation Products, Inc.*, 241 Cal.App.2d 726, 50 Cal.Rptr. 829, 830 (1st Dist.1966); *J & M Building Specialties, Inc. v. Marwais Steel Co.*, 176 U.S.P.Q. 269 (Cal.Super.Ct. 1972); *Equipment Advertiser, Inc. v. Harris*, 271 Minn. 451, 136 N.W.2d 302, 303–04 (1965). Generally, if substantial time and money would be required of a competitor to develop the same information, that information has economic value. *Electro-Craft*, 332 N.W.2d 890. Plaintiff has introduced evidence that substantial time and money would be required to learn the identity of categories one, two, four, five, and six of plaintiff's exhibit 53 with the restrictions expressed above.

### (3) Confidentiality

The fourth element of the trade secret definition is a requirement that the information be the subject of plaintiff's intent to keep it confidential.[15] This element of trade secret law does not require the main-

---

**14.** The statutory definition of trade secret also encompasses information that has commercial value from a negative viewpoint. For example, the result of lengthy and expensive research which shows that a certain process will *not* work could be of great value to a competitor. 14 U.L.A. at 543.

**15.** The existence of a trade secret is a question of fact, secrecy being a basic element. 1 *Milgrim* ¶ 2.03 at 2–32. Courts require the putative trade secret holder to take such efforts to maintain secrecy as are reasonable under the circumstances. Consequently, to determine if secrecy has been maintained, the trier of fact must consider the entirety of circumstances surrounding its use. *Id.* at 2–38. A trade secret

does not lose its character by being confidentially disclosed to agents or employees, without whose assistance it could not be made of any value. *Id.* at 2–38; *Components for Research, Inc. v. Isolation Products, Inc.*, 241 Cal.App.2d 726, 50 Cal.Rptr. 829, 831 (1st Dist.1966). Of course, the mere fact that plaintiff may not have employed the fullest range of protective techniques available will not defeat claims of trade secret provided the techniques employed were reasonable under the circumstances. 1 *Milgrim* § 2.04 at 2–45; *U.S.M. Corp. v. Marson Fastener Corp.*, 379 Mass. 90, 393 N.E.2d 895, 899–903 (1979) (plaintiff need not "take heroic measures to preserve" secrecy).

tenance of absolute secrecy; only partial secrecy or qualified secrecy has been required under the common law. *Electro-Craft*, 332 N.W.2d at 901, *citing Radium Remedies Co. v. Weiss*, 173 Minn. 342, 347–48, 217 N.W. 339, 341 (1928). The efforts required to maintain secrecy are those "reasonable under the circumstances." 14 U.L.A. at 543.

■ Surgidev has taken ample precautions to protect the secrecy of the PMMA monofilament process. The PMMA monofilament is manufactured at a facility physically removed from the IOL manufacturing facility. Access to that facility is strictly limited. Other manufacturers in the industry exercise similar precautions. Interestingly, in the initial plans for ETI drawn up by Fitzsimmons, he set forth plans to lease two manufacturing facilities, one for the IOL manufacturing equipment, and a separate facility physically removed from the first for the manufacture of PMMA monofilament. In so doing Fitzsimmons inferentially agreed that the PMMA monofilament process is a trade secret subject to security measures.

■ Plaintiff has also taken reasonable precautions to keep certain customer information secret. A reasonable precaution to maintain the secrecy of a putative trade secret is to put employees on notice of the trade secret status of matters on which they are working. *People v. Serrata*, 62 Cal.App.3d 9, 133 Cal.Rptr. 144, 152 (1st Dist.1976); *Green v. Stratoflex, Inc.*, 596 S.W.2d 305, 306 (Tex.Civ.App.1980) (requiring employees to sign non-disclosure agreements put those employees on notice of trade secrets). One way in which to put employees "on notice" is to require them to sign secrecy or non-disclosure agreements. *Green*, 596 S.W.2d at 306; *Rapco Foam, Inc. v. Scientific Applications, Inc.*, 479 F.Supp. 1027, 1028 (S.D.N.Y.1979) (secrecy agreements); *Electronic Data Systems Corp. v. Kinder*, 497 F.2d 222, 223 (5th Cir.1974) (restrictive covenants); *Smoke-Enders, Inc. v. Smoke No More, Inc.*, 184 U.S.P.Q. 309, 312–14 (S.D.Fla.1974) (confidentiality agreements). By requiring each

of the individual defendants to sign non-disclosure agreements, plaintiff put the defendants on notice that certain customer information was confidential. This was a reasonable security precaution.

A second reasonable precautionary measure is one restricting visitors to sensitive areas of a plant or manufacturing facility. *Rapco Foam*, 479 F.Supp. at 1028 (restricted plant access); *Gillette Co. v. Williams*, 360 F.Supp. 1171, 1173 (D.Conn.1973) (visitors sign in); *Anaconda Co. v. Metric Tool & Die Co.*, 485 F.Supp. 410, 415 (E.D.Pa. 1980); *Telex Corp. v. IBM*, 367 F.Supp. 258, 330 (N.D.Okla.1973) (magnetic locks). *See also* cases holding that failure to restrict visitor access defeats trade secret claim: *Pressure Science, Inc. v. Kramer*, 413 F.Supp. 618, 621 (D.Conn.1976); *Wheelabrator Corp. v. Fogle*, 317 F.Supp. 633, 638 (W.D.La.1970), *aff'd per curiam*, 438 F.2d 1226 (5th Cir.1971); *Wilson Certified Foods, Inc. v. Fairbury Food Products, Inc.*, 370 F.Supp. 1081, 1085–86 (D.Neb. 1974). As stated above, Surgidev restricts access to its PMMA monofilament facility. In addition, access to Surgidev's Minneapolis sales and administrative headquarters is restricted. Visitors are required to sign in and any unknown interlopers are questioned and if necessary escorted from the premises. These are reasonable security precautions.

A third reasonable security precaution is to separate sensitive departments or processes from the central facility. *Serrata*, 133 Cal.Rptr. at 152–53; *Ransburg Electro-Coating Corp. v. Spiller & Spiller, Inc. Co.*, 340 F.Supp. 1385 (N.D.Ill.1972) (separate laboratory for advanced research). As stated above, Surgidev has observed this precaution with respect to its PMMA monofilament manufacturing facility.

A fourth and quite obvious reasonable security measure is the practice of keeping secret documents in locked files. *Serrata*, 133 Cal.Rptr. at 152–53; *Basic Chemicals, Inc. v. Benson*, 251 N.W.2d 220, 228 (Iowa 1977); *Auto Wax Co. v. Byrd*, 599 S.W.2d 110, 112 (Tex.Civ.App.1980) (failure to keep

locked file probative); *Capsonic Group, Inc. v. Plas-Met Corp.*, 46 Ill.App.3d 436, 5 Ill.Dec. 41, 361 N.E.2d 41, 44 (1st Dist.1977) (failure to keep allegedly secret drawings under lock and key probative). Surgidev keeps all sales records in locked files at its Minneapolis sales and administrative headquarters. This is a reasonable security precaution.

A fifth reasonable security precaution is distribution of allegedly secret materials on strictly a "need-to-know" basis. *Mixing Equipment Co. v. Philadelphia Gear, Inc.*, 436 F.2d 1308, 1314 (3d Cir.1971); *Koch Engineering Co. v. Faulconer*, 227 Kan. 813, 610 P.2d 1094, 1098 (1980); *Gillette*, 360 F.Supp. at 1173. Surgidev produces monthly and quarterly detailed sales reports which are distributed to sales and marketing personnel on a strict "need-to-know" basis. Field sales representatives receive sales data only for their assigned sales territory. Regional sales managers receive sales data only for the regions to which they are assigned. Only certain high-level company executives are exposed to sales figures company-wide. When a sales employee departs the company he or she is required to surrender all sales data in their possession. These are reasonable security precautions.

### b. Disclosure, Legal Relationship, and Use

Having established its ownership of the putative trade secrets, plaintiff must establish disclosure, the existence of a legal relationship, and defendants' intent to use the trade secret information.[16]

Defendants do not dispute that plaintiff disclosed the identity of the categories of ophthalmologists discussed above in the course of the employer-employee relationship. As regional sales managers Greiling and Fagan were privy to Surgidev sales reports for their sales regions. As a field sales representative McCoy was privy to sales reports for her territory. Fitzsimmons had access to sales reports for Surgidev nationwide, as did Kalfon. Fitzsimmons and Kalfon also had access to Surgidev's contracts with core implanters. Plaintiff voluntarily disclosed this information to defendants in the course of long-standing employer-employee relationships.

Generally, plaintiff may establish the requisite "legal relationship" by proof of an express contractual agreement or agreements between it and the defendants or by proof of a confidential relationship giving rise to a duty not to disclose. 1 *Milgrim* § 7.07[1]. The confidential nature of the employer-employee relationship imposes per se a duty upon the employee not to use or disclose his employer's trade secrets. 1 *Milgrim* § 3.03 at 3–93; § 5.02[1] at 5–7 n. 6, citing *Peerless Oakland Laundry Co. v. Hickman*, 205 Cal.App.2d 556, 23 Cal.Rptr. 105 (1st Dist.1962); *Tlapek v. Chevron Oil Co.*, 407 F.2d 1129 (8th Cir.1969). Because there can be no protection of a trade secret if the disclosure of it is not made in the context of a confidential relationship or express contract, 1 *Milgrim* § 4.03 at 4–22, it is the conjunction of a protectible trade

---

**16.** Misappropriation involves the acquisition, disclosure or use of a trade secret through improper means. *Electro-Craft*, 332 N.W.2d at 903; Minn.Stat. § 325C.01, subd. 3. "Improper means" are defined as: theft, bribery, misrepresentation, breach or inducement of breach of a duty to maintain secrecy, or espionage through electronic or other means. Minn.Stat. § 325C.01, subd. 2; Cal.Civil Code § 3426, subd. (a). Trade secrets are protected only when they are disclosed or used through improper means. *Chicago Lock Co. v. Fanberg*, 676 F.2d 400, 404 (9th Cir.1982). The protection afforded trade secrets is not intended solely to reward or promote the development of secret processes, but rather is to protect against breaches of faith and the use of improper methods to obtain information. *Jostens*, 318 N.W.2d at 701, citing 1 *Milgrim, Trade Secrets* § 12.01. "The protection accorded the trade secret holder is against the disclosure or unauthorized use of the trade secret by those to whom the secret has been confided under the express or implied restrictions of non-disclosure or nonuse." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315 (1974). Thus, in order to prove misappropriation, plaintiff must establish that defendants acquired the trade secret as a result of a confidential relationship, and that defendants have used or disclosed the trade secrets. *Jostens*, 318 N.W.2d at 701.

secret and a confidential relationship which gives rise to a cause of action for misappropriation. A confidential relationship arises where one party places its trust in a second party, the second party knows of the trust reposed in him, and under the circumstances of the case breach of that trust is wrongful. *U.S. Lift Slab Corp. v. C.D. Wailes Co.*, 113 U.S.P.Q. 228, 229 (Cal.Sup. Ct.1956). The courts have almost uniformly found that the employer-employee relationship is one which gives rise to a confidential relationship.[17] 1 *Milgrim* § 5.02[1] at 5–6 n. 5, *citing Monogram Industries, Inc. v. Sar Industries, Inc.*, 64 Cal.App.3d 692, 134 Cal.Rptr. 714, 721 (2d Dist.1976); *Radium Remedies Co. v. Weiss*, 173 Minn. 342, 217 N.W. 339 (1928). Of course, prior employment does not without more impose upon the employee a duty not to compete with his former employer. It merely imposes a duty not to use skills obtained in the prior employment to violate obligations arising from the relationship of trust implicit in the former employment. 1 *Milgrim* § 5.03[1] at 5–26; *American Loan Corp. v. California Commercial Corp.*, 211 Cal.App.2d 515, 27 Cal.Rptr. 243, 247 (4th Dist.1963). Here, the longstanding employee relationship which each of the individual defendants had with Surgidev established the requisite "legal relationship."

The fourth element of the trade secret cause of action requires proof that there is an intention on the part of the defendants to use or disclose the putative trade secrets, or alternatively, that under the circumstances of the case, there is a high degree of probability of inevitable disclosure. A competing corporation formed by former employees of the plaintiff is naturally subject to some degree of probability that the newly-formed corporation will utilize trade secrets gained in the plaintiff's employ. *Weinschel Engineering Co. v.*

*Midwest Microwave, Inc.*, 297 A.2d 443 (Del.Ch.1972); *Eastman Kodak Co. v. Powers Film Products, Inc.*, 189 App.Div. 556, 179 N.Y.S. 325, 330 (4th Dept.1919) (rendition of services along defendants' special line of training would almost necessarily impart plaintiff's trade secrets). Some courts have found that where a defendant commences competitive activity which might jeopardize plaintiff's trade secrets, and where such activity is in breach of a valid restrictive covenant, the Court might presume that wrongful disclosure will take place. 1 *Milgrim* § 7.07[1] at 7–158.

Here, there is no need to rely on a presumption of wrongful intent, inasmuch as defendants have affirmatively demonstrated their intent to use some of plaintiff's customer information, as discussed above. Fitzsimmons, McCoy, and Kalfon have each solicited Surgidev customers in connection with their duties at ETI. Fitzsimmons retained Surgidev documents, thus giving rise to an inference of intent to use. ETI's business plan as disclosed in its prospectus indicates that ETI's sales force planned to contact high volume implanters with whom the individual defendants had forged beneficial relationships while at Surgidev. Plaintiff has established that the defendants have disclosed or will disclose the putative trade secrets to plaintiff's detriment.

■ Because plaintiff has established each of the four elements of the trade secret cause of action—ownership, disclosure, a legal relationship and use—as to categories one (high volume implanters), two (converting implanters), four (core implanters), five (consultants), six (non-medical consultants), and seven (medical monitor), defendants will be enjoined from soliciting these categories of ophthalmologists, with the restrictions and qualifications set forth above. Because plaintiff failed to

---

**17.** As stated in the Milgrim Treatise:

The employer-owner's claim to protection of proprietary trade secrets disclosed to or learned by an employee in the course of employment can be justified upon two main grounds. (1) Such protection encourages the development and use, to the consuming public's advantage, of new and improved methods, techniques, ideas and concepts. (2) Such protection permits job opportunities and employment stability.

1 *Milgrim* § 5.02[2] at 5–18.

establish ownership of its other categories of putative trade secret customer information, relief will be denied with respect to those categories. The sole remaining issue is the duration of the injunctive order.

### c. Duration

 Plaintiff has requested that defendants be enjoined from solicitation through December 31, 1987. The Court finds this to be a reasonable restriction. Normally, the duration of an injunction is designed to preclude defendants' wrongful activities for a period of time reasonably necessary to protect plaintiff's interest; the period of time that would be required for independent development of the protected information is the prevailing standard. 2 *Milgrim* § 7.08[1] at 7–185, *citing Brunswick Corp. v. Outboard Marine Corp.*, 79 Ill.2d 475, 38 Ill.Dec. 781, 783, 404 N.E.2d 205, 207 (1980); *Heatbath Corp. v. Ifkovits*, 117 Ill.App.2d 158, 254 N.E.2d 139 (2d Dist.1969) (proper period of injunction is time defendants would have required to independently develop the trade secret information); *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 328 N.Y.S.2d 423, 278 N.E.2d 636 (1972) (in light of ease of plaintiff's development of its trade secret customer list, a permanent injunction of three months was found sufficient); *Anaconda Co. v. Metric Tool & Die Co.*, 485 F.Supp. 410, 429 (E.D.Pa.1980) (finding of independent development period of sixteen months provided basis for duration of injunction); *Sperry Rand Corp. v. Electronic Concepts, Inc.*, 325 F.Supp. 1209, 1219 (E.D.Va.1970) (two-year injunction awarded in light of conclusion that plaintiff entitled to exclusive use of trade secrets until such time as competitors duplicate them by independent legitimate research); *Plant Industries, Inc. v. Coleman*, 287 F.Supp. 636 (C.D.Cal.1968) (eighteen-month injunction granted on theory that such time necessary for independent development). While the evidence as to how long a diligent salesperson in the industry would require to develop the protected customer information was conflicting, on balance the Court finds that fifteen months is a reasonable approximation. Accordingly, defendants will be enjoined through December 31, 1987.[18]

### C. Breach of Contract

 Plaintiff seeks to enforce the nondisclosure agreements [19] entered into by

---

**18.** Although William Fagan is not a party to this lawsuit, the Court's ban on solicitation applies to him as well as to the individual defendants. Injunctive relief in a trade secret case is not limited to the party or parties who received the trade secret subject to a duty not to disclose; third parties who receive trade secret information from such parties may also be enjoined. Individuals not joined as party defendants may be subjected to an injunction in their capacity as employees of a defendant corporation. 2 *Milgrim* § 7.08[1] at 7–182; *Greenly v. Cooper*, 77 Cal.App.3d 382, 143 Cal.Rptr. 514, 523 (4th Dist. 1978); *Solo Cup Co. v. Paper Mach. Co.*, 359 F.2d 754, 760 (7th Cir.1966). Defendants may not circumvent the Court's ruling by utilizing Fagan or other employees of ETI not party to this lawsuit to solicit the prohibited ophthalmologists.

**19.** Certain of plaintiff's putative trade secrets are protectible under the tort law of trade secrets as discussed above. This customer information also derives protection from the fact that defendants executed agreements not to use or disclose Surgidev trade secrets. Customer information which has some basis for a claim of secrecy can be protected by a restrictive covenant, provided the covenants are reasonable as to duration, area, and activity. 1 *Milgrim* § 2.09[7][ii] at 2–194 to 2–197; *Gordon v. Landau*, 49 Cal.2d 690, 321 P.2d 456 (1958); *Golden State Linen Services, Inc. v. Vidalin*, 69 Cal. App.3d 1, 137 Cal.Rptr. 807 (1st Dist.1977); *Walker Employment Services, Inc. v. Parkhurst*, 300 Minn. 264, 219 N.W.2d 437, 441–42 (1974); *Wallich v. Koren*, 80 Cal.App.2d 223, 181 P.2d 682 (2d Dist.1947); *Hollingsworth*, 622 F.2d 1338–39; *Cherne*, 278 N.W.2d at 83; *Medtronics, Inc. v. Medical Design Research, Inc.*, 398 F.Supp. 849, 853–55 (C.D.Cal.1975); *Coffee Systems of Atlanta v. Fox*, 226 Ga. 593, 176 S.E.2d 71 (1970) (limitations on calls on former customers); *USAchem, Inc. v. Goldstein*, 512 F.2d 163, 167–69 (2d Cir.1975) (eighteen-month restrictive covenant valid to prevent defendant from calling upon plaintiff's customers serviced by defendant, although relief denied on other grounds); *Harwell Enterprises, Inc. v. Heim*, 276 N.C. 475, 173 S.E.2d 316 (1970) (two-year covenant, nationwide, held valid restraint to protect plaintiff's silk screen process information); *Certified Laboratories of Texas, Inc. v. Rubinson*, 303 F.Supp. 1014 (E.D.Pa.1969) (enforcing covenant only as to actual customers serviced by

each of the individual defendants. Plaintiff seeks to enjoin defendants from (1) soliciting for employment any Surgidev employees for a period of two years; (2) hiring any Surgidev employees for a period of six months; and (3) selling any ETI IOLs for a period of nine months. *See* Plaintiff's Proposed Preliminary Injunction ¶ 1, 2, 10.

California Business and Professions Code § 16600 provides:

> Invalidity of Contracts. Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void.

The California courts have recognized that a former employee has the right to engage in competitive business for himself and to enter into competition with his former employer, even for the business of those who had formerly been the customers of his former employer, provided that such competition is fairly and legally conducted. *Continental Car-Na-Var Corp. v. Mosley,* 24 Cal.2d 104, 110, 148 P.2d 9 (1944). As stated in *Mathews Paint Co. v. Seaside Paint and Lacquer Co.,* 148 Cal.App.2d 168, 306 P.2d 113 (1957):

> Some knowledge gained by an employee is of such a general character that equity will not restrict its later use.... A salesman who leaves one employer has the right to enter the employment of a competitor. He necessarily is possessed of information gained in the earlier employment which will enable him to better succeed in later ones.

Thus, the California courts have held that a restrictive covenant which purports to prohibit competitive business activity is per se invalid. *See, e.g., Bosley Medical Group v. Abramson,* 161 Cal.App.3d 284, 207 Cal. Rptr. 477, 479–480 (1984); *Radiant Industries, Inc. v. Skirvin,* 33 Cal.App.3d 401, 109 Cal.Rptr. 96, 97 (1973); *Loral Corp. v. Moyes,* 174 Cal.App.3d 268, 219 Cal.Rptr. 836, 844 (1985). Exceptions to this per se rule of section 16600 are set forth in sections 16601 and 16602 where the non-compete clause is ancillary to the sale of the goodwill of a business or all the shares held in a corporation or all the assets of a partnership. In addition, the courts have recognized three judicially-created exceptions to section 16600: exclusive employment contracts, restrictions on the use of land, and insubstantial restrictions on a trade, business, or profession. *See Motown Record Corp. v. Brockert,* 160 Cal. App.3d 123, 207 Cal.Rptr. 574 (1984); *King v. Gerold,* 109 Cal.App.2d 316, 240 P.2d 710 (1952). Quite obviously, none of these statutory or judicially-conceived exceptions are applicable to the case at bar. Accordingly, to the extent plaintiff seeks to prohibit defendants from engaging in IOL sales at all for a designated period of time, plaintiff's request for relief will be denied.[20]

Even were it to be assumed that the non-competition clause of the non-disclosure agreement is not void *per se,* the evidence establishes that plaintiff has

---

defendant within former sales territory). *See generally* 1 *Milgrim* § 2.09[7] at 2–208 n. 421. Otherwise stated, the existence of a valid contractual covenant binding defendants not to use Surgidev's trade secrets augments the Court's finding that certain customer information is protectible in that the information is protectible under either a tort or contract theory. The protection afforded plaintiff by tort and contract law is coextensive: to the extent that the customer information constitutes a trade secret, it may be protected by a valid contractual covenant, and conversely, to the extent the information is not a trade secret, a contractual covenant which purports to restrict its use is to that extent invalid.

**20.** The fact that the non-compete clauses of the non-disclosure agreements are void per se does not void the agreements *in toto.* In *Medtronic* the Eighth Circuit recognized that notwithstanding California's statutory scheme prohibiting lawful employment after termination of employment that restrictive covenants are nonetheless enforceable in California insofar as they related to the identity of, or dealings with, classes of customers not otherwise readily known. *Medtronic,* 684 F.2d at 567–69. Further, since trade secrets are indisputably property rights, and since in many cases they can be maintained or protected only via express contractual provisions, state laws which purport to deny the enforceability of such contractual provisos across the board would raise "a spate of due process problems." 1 *Milgrim* § 3.05[1] at 3–116.

waived its rights under the agreement. Waiver is the intentional relinquishment of a known right with knowledge of the facts. *A.J. Industries, Inc. v. Ver Halen*, 75 Cal. App.3d 751, 142 Cal.Rptr. 383, 388 (1977). The doctrine of equitable estoppel gives rise to the principle that "a person may not deny the existence of a state of facts if he intentionally led another to believe a particular set of circumstances to be true and to rely upon such belief to his detriment." *Strong v. County of Santa Cruz*, 15 Cal.3d 720, 125 Cal.Rptr. 896, 898, 543 P.2d 264 (1975) (en banc).

█ Here, the evidence overwhelmingly establishes that Surgidev has permitted its employees, including key sales and marketing personnel, to leave Surgidev and to take employment with competitor companies. Sales and marketing personnel who left Surgidev to take employment with competitor corporations include: Bruce Bartlett (ORC), Dan Buchenberger (Storz), Bill Burge (AMO), Bob Clark (American), Steve Downing (ISP), Bruce Gordon (Cilco), Ron Helton (Precision-Cosmet), John Iselin (Ioptex), Mark Kania (CooperVision), Greg Kunce (American), Bonnie LeMay (ISP), Russell Lewis (Precision-Cosmet), Vicki Marino (Ioptex), John McMahon (Storz), Tom McSunnas (American), Rich Miller (AMO), Jed Palmacci (CooperVision), Jim Reinsel (American), Karen Rice (Coburn), Jim Schendel (IOLab), Joe Schurig (Intermedics), Don Sestrich (Intermedics), Nancy Shipley (Ioptex), Cliff Spain (Coburn), Mark Swanni (Intermedics), Jim Tiffany (Storz), Mike Williams (Storz), Sandy Wilson (Precision-Cosmet). *See* Defendants' Exh. 99. A plethora of customer service, research and development, manufacturing, engineering, and regulatory employees have also been permitted to depart Surgidev and take competitive employment. In fact, Surgidev has engaged sales personnel who have departed other IOL concerns, including former IOLab sales staff (Bartlett, Joe Connor, Downing, Joe Kirkland, Lewis) and former Cilco sales personnel (Downing, Gordon). Plaintiff admits that with the exception of the instant litigation it has never attempted to prevent a Surgidev employee from leaving the company and taking employment with a competitor and Dennis Gears declared that when he left Surgidev Dennis Grendahl informed him that he was free to work for another IOL company. Under the circumstances, it would be inequitable to permit plaintiff to now rely on a non-compete agreement which it has so blithely ignored in the past.[21]

█ The non-disclosure agreements executed by each of the individual defendants

---

**21.** The reasonableness of a restriction is often tested by resort to three questions: (1) "is [the restriction] no greater than necessary to protect the employer in some legitimate business interest; (2) is it not unduly harsh and oppressive in curtailing the employee's legitimate efforts to earn a livelihood; and (3) is it in accord with a sound public policy." 1 *Milgrim* § 3.02[2] at 3–78. As stated in the *Milgrim* treatise, the basic rule is that if the restraint is reasonable it is not contrary to public policy and will be enforced. 1 *Milgrim* § 3.05[1] at 3–105. A reasonable restraint will be enforced even absent a finding of trade secrets, *Milgrim* at 3–105 n. 6. In *Bennett v. Storz Broadcasting Co.*, 270 Minn. 525, 534, 134 N.W.2d 892, 899 (1965), the Minnesota court set forth the test to be employed with respect to restrictive covenants not to compete in employment agreements:

The test applied is whether or not the restraint is necessary for the protection of the business or good will of the employer, and if so, whether the stipulation has imposed upon the employee any greater restraint than is reasonably necessary to protect the employ-

er's business, regard being had to the nature and character of the employment, the time for which the restriction is imposed, and the territorial extent of the locality to which the prohibition extends.

Restrictions which are broader than necessary to protect the employer's legitimate interest are generally held to be invalid, and the determination of the necessity for the restriction is dependent upon the nature and extent of the business, the nature and extent of the service of the employee, and other pertinent conditions.

(Footnote omitted.) *See also Walker Employment Service, Inc. v. Parkhurst*, 300 Minn. 264, 219 N.W.2d 437 (1974). The reasonableness of the covenant not to compete must be evaluated in the context of the employee's responsibilities and functions, as an employer cannot "unreasonably" extract from its employees commitments which are "far broader" than the employee's "actual functions and status." *Eutectic Welding Alloys Corp. v. West*, 281 Minn. 13, 19, 160 N.W.2d 566, 570 (1968).

also contains a clause which proscribes the diversion of Surgidev employees by a former employee now engaged in a competitive business. Defendants have not claimed that this clause of the agreement is voided by section 16600. Accordingly, defendants will be enjoined from soliciting or attempting to solicit Surgidev employees through December 31, 1986. Of course, nothing in the non-disclosure agreements prohibits defendants from publishing advertisements for employment in newspapers of general circulation or from receiving and considering applications for employment submitted by Surgidev employees who have not been actively solicited by defendants.

■ Plaintiff submitted extensive testimony and evidence in an attempt to establish that the defendants breached clause 5.1 of the non-disclosure agreements by undertaking formation of ETI while still employed at Surgidev. In particular, plaintiff offered evidence of a golf outing in September, 1984, at which Fitzsimmons purportedly expressed his intention to form an IOL company to compete with Surgidev, of a telephone call placed by Kalfon from Surgidev offices to the offices of Burns & Levinson in December, 1984 (Burns & Lev-

inson was later retained as corporate counsel for ETI), of a meeting between Kalfon and Jonnie Williams at Surgidev's Minneapolis offices sometime in 1984, and of an exchange between Greiling and Joyce Del Pico, a Surgidev field sales representative, wherein Greiling allegedly told Del Pico to suppress a rumor that Fitzsimmons was forming a new IOL company. While some facts in evidence do point to a conclusion that the defendants undertook clandestine formation of ETI while still in Surgidev's employ,[22] on balance the Court finds that plaintiff has failed to make out a breach of clause 5.1. Each of the individual defendants articulated justifiable reasons for leaving Surgidev, including the company's general sales decline, unpaid salary and bonuses, unfulfilled promotion commitments, and other factors. Further, the evidence establishes that Surgidev has experienced a remarkably high rate of turnover throughout the relevant time period. Under the circumstances, the Court cannot find that defendants breached the non-disclosure agreements by engaging in competitive planning while on the Surgidev payroll.

### D. Tortious Interference

Paragraphs 3–6 of plaintiff's proposed preliminary injunction are directed to ETI's

---

The non-disclosure agreements expressly provide that they are governed by California law and the Court has found that California law governs construction of the agreements. Even were it to be assumed that Minnesota law is controlling, the Court finds that the non-compete agreements are patently unreasonable under Minnesota law. A total ban on competition for a period of years is unreasonable in a marketplace characterized by many new competitors, low barriers to entry, and an absence of a single, dominant manufacturer. Surgidev has stated that the ban on solicitation which it proposes (plaintiff's exhibit 53) encompasses less than ten percent of the total market for IOLs. Even were the Court to prohibit defendants from using any of the customer information which they gained while at Surgidev, therefore, fully ninety percent of the IOL market would remain for exploitation. Under the circumstances, a total ban on competition for a period of years would not be reasonable.

22. For example, Kalfon and McCoy submitted letters of resignation which contained strikingly similar language. Kalfon and McCoy went to

work for CME–SAT following their resignations, a company controlled by Williams and O'Donnell, who are also ETI shareholders. Greiling resigned from Surgidev effective August 2, 1985 and by August 5, 1985 was on the ETI payroll.

The reasons given by the individual defendants for departing Surgidev are quite compelling however. Kalfon was demoted, and was apparently harangued by Grendahl in the presence of others. Grendahl allegedly told a group of Surgidev sales personnel that neither Fitzsimmons nor Kalfon knew what they were doing and that Grendahl was taking over the sales and marketing arm of the company. Greiling was promised a bonus, and after a check was delivered and deposited in Greiling's account, the money was reclaimed by Surgidev. McCoy was forced to accept a transfer to Atlanta, Georgia and was not given a promised salary boost. Each of the individual defendants and Fagan expressed frustration at the direction Surgidev was taking, and stated that Surgidev's failure to develop new products and to correct accounting and financial errors made job performance extremely difficult.

relationship with Myron Lippman. Plaintiff seeks to enjoin Lippman from consulting with or otherwise advising ETI as to the manufacture of PMMA monofilament or IOL lens technology generally. Plaintiff relies primarily on the October, 1982 "Deal Memo" entered into by Lippman whereby Lippman sold the PMMA monofilament process to Surgidev. Plaintiff claims that ETI's attempts to employ Lippman constitute tortious interference with the terms of the "Deal Memo." Elements of the tortious interference cause of action are set forth in the Restatement (Second) of Torts § 766B (1977) (adopted by the Eighth Circuit in *Missouri v. National Organization for Women, Inc.*, 620 F.2d 1301, 1316 (8th Cir.1980)):

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

Restatement § 766B. Factors to be considered in determining whether the interference is improper are catalogued in the Restatement (Second) of Torts § 767 (1977) (cited with approval in *Missouri v. NOW*, 620 F.2d at 1316):

> In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:
>
> (a) the nature of the actor's conduct,
>
> (b) the actor's motive,
>
> (c) the interests of the other with which the actor's conduct interferes,
>
> (d) the interests sought to be advanced by the actor,

> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>
> (f) the proximity or remoteness of the actor's conduct to the interference and
>
> (g) the relations between the parties.

Restatement § 767.

 The Court finds that defendants' attempts to engage Lippman constitute tortious interference. Plaintiff entered into a binding agreement with Lippman whereby Lippman conveyed the PMMA monofilament process to Surgidev in return for good and valuable consideration. Defendants' attempts to engage Lippman for the purpose of manufacturing PMMA monofilament amount to an attempt to disrupt and interfere with Lippman's contractual relationship with Surgidev. Accordingly, the Court will enjoin defendants from engaging Lippman for these purposes. The terms of the injunctive relief will correspond with the terms of the Lippman settlement to which the parties have expressed their consent.

**CONCLUSION**

Accordingly, based on the foregoing, and upon review of all the files, records, and proceedings herein,

IT IS ORDERED That defendants are enjoined from:

1. Soliciting or attempting to solicit through December 31, 1986, any Surgidev employees to become employees, consultants or independent contractors to or for defendants; provided, however, that defendants are not enjoined from publishing advertisements for employment in newspapers of general circulation in communities where defendants are seeking employees or representatives or in periodicals distributed within the IOL industry; and provided further that defendants are not enjoined from receiving and considering applications for employment from Surgidev employees or from hiring Surgidev employees so long as defendants do not make the first contact with the Surgidev employees regarding employment.

2. Having Myron E. Lippman be employed by, work for, perform any services for, or directly or indirectly give business or technical assistance, including but not limited to teaching or technical assistance relating to the manufacture of polymeythlmethacrylate ("PMMA") monofilament, or having Myron E. Lippman directly or indirectly supply PMMA monofilament, to Eye Technology, Inc., or its successors and assigns, officers, directors, and employees in any other manner whatsoever through April 7, 1987.

3. Soliciting or attempting to solicit Dr. Richard L. Lindstrom to work or cooperate with Eye Technology and its officers, directors, employees, agents and those acting in concert with them to design, develop and/or manufacture surgical viscous adjunct or super balanced salt solution or both so long as Surgidev has an exclusive agreement to manufacture and sell said products; provided, however, that defendants are not enjoined from receiving and considering any application by Dr. Lindstrom for designing, developing and/or manufacturing said products so long as defendants do not make the first contact with Dr. Lindstrom regarding same; and provided further that defendants are not enjoined from soliciting or attempting to solicit or from retaining Dr. Richard L. Lindstrom to work or cooperate with Eye Technology and its officers, directors, employees, agents and those acting in concert with them to design, develop and/or manufacture any other products.

4. Soliciting or attempting to solicit Dr. Larry Leiske to work or cooperate with Eye Technology and its officers, directors, employees, agents and those acting in concert with them to design, develop and/or manufacture a posterior chamber lens, which is the subject matter of plaintiff's exhibit 33 ("Abstract of Disclosure"), so long as Surgidev has an exclusive agreement to manufacture and sell said lens; provided however, that defendants are not enjoined from receiving and considering any application by Dr. Leiske for designing, developing and/or manufacturing said lens so long as defendants do not make the first contact with Dr. Leiske regarding same; and provided further that defendants are not enjoined from soliciting or attempting to solicit or from retaining Dr. Leiske to work or cooperate with Eye Technology and its officers, directors, employees, agents and those acting in concert with them to design, develop and/or manufacture any other products.

5. Soliciting or attempting to solicit Dr. Evan Jones to work or cooperate with Eye Technology and its officers, directors, employees, agents and those acting in concert with them to design, develop and/or manufacture a "New Improved Intraocular Lens" which is the subject matter of Disclosure Document No. 130,138 filed with the United States Patent and Trademark Office on August 20, 1984, so long as Surgidev has an exclusive agreement to manufacture and sell said lens; provided, however, that defendants are not enjoined from receiving and considering any application by Dr. Jones for designing, developing and/or manufacturing said lens so long as defendants do not make the first contact with Dr. Jones regarding same; and provided further that defendants are not enjoined from soliciting or attempting to solicit or from retaining Dr. Jones to work or cooperate with Eye Technology and its officers, directors, employees, agents and those acting in concert with them to design, develop and/or manufacture any other products.

6. Soliciting or attempting to solicit any of the individuals listed on Attachment A hereto as customers of Eye Technology through December 31, 1987.

Plaintiff's action for preliminary and permanent injunctive relief is in all other respects denied.

## ON MOTIONS TO AMEND

This matter is before the Court on defendants' motion pursuant to Rules 52(b), 59(e), 60(b)(5), and 60(b)(6) of the Federal Rules of Civil Procedure for an order amending and modifying findings and reconsidering and vacating or altering and

modifying the Court's order dated October 10, 1986 granting in part and denying in part plaintiff's motion for preliminary and permanent injunctive relief. *Surgidev Corp. v. Eye Technology, Inc., et al.*, 648 F.Supp. 661 (D.Minn.1986). Plaintiff has brought a countermotion pursuant to Rule 52(b) of the Federal Rules of Civil Procedure for an order amending in certain respects the Court's October 10, 1986 order. The facts of the case are set forth in some detail in the Court's prior order and will not be repeated here. Defendants' motion will be granted in part and denied in part. Plaintiff's motion will be granted.

*A. Defendants' Omnibus Motion*

Defendants move to amend, modify, reconsider, vacate, or alter the Court's October 10 order. Defendants seek a Court order amending, modifying, vacating, or altering the Court's findings of fact based on the following arguments:

A. Certain Findings and Conclusions Made by the Court in Its Memorandum and Order Are Not Substantiated by Evidence in the Trial Record and Should be Amended and Reconsidered.

1. The Court's finding that Surgidev waived its right to enforce the restrictive covenant in the Invention Agreement pertaining to competitive employment compels a finding that Surgidev has waived the right to claim confidentiality of its customer information.

2. The record evidence does not support the finding that the identity of Surgidev's high volume implanters was not readily accessible to others in the industry.

3. The Court's finding that defendants have used confidential information or intend to use it is not supported by the evidence.

5.[1] The evidence does not support the finding that the entrance of Ameri-

cal into the market in 1982 caused a decline in Surgidev sales.

6. The Court's definition of a "high-volume" implanter is not supported by the evidence.

7. The injunction list for "Converting Physicians" contains the names of individuals who did substantially all of their implants after defendants and Fagan left Surgidev.

8. The evidence does not support the conclusion that ETI tortiously interfered with Surgidev's contractual relations with Lippman.

B. This Court Should Reconsider and Modify the Scope of Its Injunction Relating to the Solicitation of Certain Doctors.

1. the duration of the injunction is too long.

2. This Court Should modify Paragraph 6 of Its Order to Clarify the Prohibition on Solicitation

3. The injunction should be modified to remove certain individuals in light of ETI's acquisition of Americal.

*See* Defendants' Motion for Amended and Modified Findings And To Reconsider And Vacate Or Alter And Modify Judgment And Order Pursuant to Rules 52(b), 59(e) And 60(b)(5) And (6), F.R.C.P.

As to defendants' argument A.2. above, defendants point out that at page 38 of the October 10 order the Court erroneously made reference to the declaration of Gene Beckstein submitted by plaintiff in connection with its motion for preliminary injunctive relief. Quite obviously, the Court's reliance on the Beckstein declaration is misplaced, and the October 10 order is hereby modified to correct this oversight. Wholly apart from the Beckstein declaration, however, ample evidence in the record supports the Court's finding that the identity of Surgidev's high volume implanters is not readily accessible to others in the industry. *See Surgidev*, 648 F.Supp. at 682–84; Shumate Tr.Test.Vol. I, 55–58; Snyder Tr.Test. Vol. I–B, 1–3; Webb Tr.Test.Vol. III, 528;

---

**1.** Apparently through inadvertence, defendants omitted the number "four" from its list of argu- ments.

Kalfon Tr.Test.Vol. IV, 861; Shumate Tr. Test.Vol. I, 60; Lindstrom Tr.Test.Vol. I, 157; Greiling Tr.Test.Vol. IV, 661–62; Plaintiff's Exh. 13; Plaintiff's Exh. 14; Plaintiff's Exh. 15; Plaintiff's Exh. 37. Accordingly, the Court's findings of fact that the identity of Surgidev's high volume implanters is not readily accessible to others in the industry will not be disturbed.

As for defendants' remaining arguments in support of their motion to reconsider and amend the Court's findings of fact, the Court declines defendants' invitation to relitigate issues comprehensively briefed, argued, analyzed, and discussed in connection with proceedings culminating in issuance of the Court's October 10 order. Defendants' motion with respect to these arguments will be denied.

■ Turning to defendants' argument in support of modification of the scope of injunctive relief, upon review it appears that clarification of the scope of the relief entered is in order. Accordingly, the Court's October 10, 1986 order will be amended to permit defendants to maintain a sales booth or booths at professional meetings, to initiate mass mailings, and to respond to unsolicited sales inquiries. The Court finds that this amendment of its prior order is conducive to judicial economy and the interests of justice in that it may lessen the likelihood of future disputes between the parties relative to the scope of the injunction. Further, the plaintiff itself submitted a proposed injunction to this effect. In all other respects, defendants' motion for modification of the scope of injunctive relief is denied.

Defendants also move to amend paragraph 6 of the Court's October 10 order by removing from the list of prohibited physicians the names of thirty-seven physicians who have "expressed an interest" in purchasing or implanting Americal lenses and/or becoming Americal clinical investigators. Defendants have introduced "new evidence" to support their motion pursuant to Rule 60(b).

■ The Court finds it doubtful that the evidence submitted by defendants is in fact "new" evidence. Defendants have not demonstrated why the evidence was not submitted at the June 30, 1986 evidentiary hearing. Even assuming the evidence is appropriate Rule 60(b) evidence, the Court sees no compelling reason why it should amend the list of prohibited physicians. Accordingly, defendants' motion to remove the names of thirty-seven physicians from the list of prohibited physicians is denied.

Except as set forth above, defendants' motion to amend, modify, reconsider, vacate, or alter is in all respects denied.

**B. Plaintiff's Motion to Amend**

Plaintiff moves to amend the Court's factual finding that plaintiff's processes for manufacturing its intraocular lens products is not a trade secret. Plaintiff's motion is brought pursuant to Rule 52(b) of the Federal Rules of Civil Procedure.

As a preliminary matter, defendants argue that plaintiff's motion is untimely and that, accordingly, the Court is without jurisdiction to entertain the motion. A Rule 52(b) motion to amend findings must be made not later than ten days after entry of judgment. Fed.R.Civ.P. 52(b). The Court's order was filed October 10, 1986. Plaintiff's Rule 52(b) motion was filed October 24, 1986. Accordingly, defendants argue that plaintiff's motion is untimely.

■ What defendants fail to recognize is that under the Federal Rules of Civil Procedure when the period of time prescribed or allowed is less than eleven days intermediate Saturdays, Sundays, and legal holidays are excluded in the computation. Fed.R.Civ.P. 6(a). Excluding Saturdays, Sundays, and legal holidays, it is apparent that plaintiff's motion was filed nine days following entry of judgment. Plaintiff's motion is timely.

Plaintiff argues that the Court incorrectly held that a manufacturing process is generally known if several competitors in the industry use that process. The Court did not so hold. *See Surgidev,* 648 F.Supp.

at 688. (Several developers of the same information may have trade rights in that information.) Plaintiff's contention that the Court applied the incorrect legal standard is not accurate.

As to plaintiff's argument that the Court's application of that legal standard to the facts of the case was error, however, the Court has concluded that its finding of fact on this subject made at pages 54–55 of the October 10 order was unduly sweeping. Resolution of the issue as to whether plaintiff's manufacturing processes may be generally known or easily ascertainable is simply unnecessary to disposition of the matters before the Court. Accordingly, the Court's finding that plaintiff's manufacturing processes are generally known or easily ascertainable, which is in the nature of dictum in any event, is hereby vacated.

Accordingly, based on the foregoing, and upon review of all the files, records, and proceedings herein,

IT IS ORDERED that:

1. Paragraph 6 of the Court's order of October 10, 1986 in this matter is amended by the addition of the following provisions:

Provided, however, that EYE TECHNOLOGY may have a booth at any professional meetings of ophthalmologists;

Provided, however, that EYE TECHNOLOGY may initiate mass mailings of sales literature so long as the individuals listed on Attachment A hereto are not specifically targeted as recipients of such sales literature; and

Provided that EYE TECHNOLOGY may receive and respond to unsolicited expressions of interest in EYE TECHNOLOGY intraocular lenses from any of the individuals listed on Attachment A hereto.

2. The Court's finding that plaintiff's manufacturing processes are generally known or easily ascertainable is vacated.

3. Defendants' motion is in all other respects denied.

4. Plaintiff's motion is in all other respects denied.